**Cal SWENSON and Carolyn Swenson,
Plaintiffs-Appellants,**

v.

**Richard and Ralph ENGELSTAD,
Defendants-Appellees.**

No. 79–1662.

United States Court of Appeals,
Fifth Circuit.

Sept. 24, 1980.

Whittenburg, Whittenburg & Schachter, Cary Schachter, Amarillo, Tex., for plaintiffs-appellants.

Sanders, Saunders, Brian, Finney & Thomas, Robert H. Smith, Amarillo, Tex., for defendants-appellees.

Before HILL, RUBIN and ANDERSON, Circuit Judges.

**JAMES C. HILL, Circuit Judge:**

Plaintiff Cal and Carolyn Swenson commenced this action against defendants Ralph Engelstad and Richard Engelstad,[1] seeking to recover damages sustained as a result of their purchase of unregistered securities. Recovery was sought under § 12(1), § 12(2), and § 15 of the Securities Act of 1933, 15 U.S.C.A. § 77l (1), (2), § 77o ; § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), SEC Rule 10b–5, 17 C.F.R. § 240.10b–5; and § 17.50 of the Texas Deceptive Trade Practices—Consumer Protection Act, Tex.Bus. & Com.Code Ann. tit. 2, § 17.50 (Vernon Supp.1980). Prior to trial, plaintiffs' state law claims were dismissed. The remainder of the claims were submitted to a jury on special interrogatories. Based on the jury's answers, the district court entered judgment for the defendants on all the federal claims.

### I. *Facts*

In 1975, Ralph founded the Southwest Hockey League (SHL). At all pertinent times, he was the President of the SHL and its sole stockholder. Shortly after the league was formed, Richard purchased the right to start an SHL franchise in Amarillo, Texas.[2] The now defunct Amarillo Wranglers hockey team was owned by Amarillo Wranglers, Inc. The corporation initially issued 75 shares of stock. Fifty shares were purchased by Richard, and 5 shares each were purchased by Tuggie Tuckness, Bill O'Grady, Billy Parker, Tim Guss, and Ray Paetzold.[3] Before the beginning of the first season, Cal Swenson was hired to coach the Wranglers. In early 1976, the Swensons became interested in purchasing an ownership interest in Amarillo Wranglers, Inc. After several negotiating sessions between the Swensons, Richard, and Ralph, the Swensons agreed to purchase Richard's 50 shares, Tuckness's 5 shares, O'Grady's 5 shares, and Parker's 5 shares.[4] The purchase price for the 65 shares was $116,000. It is undisputed that the stock of Amarillo Wranglers, Inc., has never been registered with the Securities Exchange Commission.

### II. *§ 10(b), Rule 10b–5*

Plaintiffs alleged that Richard and Ralph made various material misrepresentations in connection with the sale. The jury found that the Swensons "intentionally refused to investigate the facts bearing upon their investment in the stock of Amarillo Wranglers, Inc." This amounts to a finding that the plaintiffs failed to exercise "due diligence" in purchasing the stock. Due diligence is an element of a cause of action under § 10(b) and Rule 10b–5. *Dupuy v. Dupuy*, 551 F.2d 1005, 1014 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). The jury's finding, which is supported by the record, bars any recovery under § 10(b) and Rule 10b–5.

### III. *§ 12(1), § 15*

#### A. *The Prima Facie Case*

The Securities Act of 1933 imposes strict liability on offerors and sellers of unregistered securities.[5] *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 686 (5th Cir. 1971). Recovery may be had under § 12(1)[6] "regardless of whether [the purchaser] can show any degree of fault, negligent or intentional, on the seller's part." *Id.* There are three

---

1. From time to time we will refer to Ralph Engelstad and Richard Engelstad merely as Ralph and Richard.

2. When the Southwest Hockey League was formed, Richard was Vice-President. He later served as Commissioner of the league.

3. Tuckness did the public relations work for the Amarillo Wranglers. O'Grady was the team's first manager.

4. Tuckness, O'Grady and Parker were not named as defendants in this suit.

5. *See generally* I. L. Loss, *Securities Regulation* 1683–99 (2d ed. 1961).

6. The prohibition on selling unregistered securities actually is found in § 5(a) of the 1933 Act, 15 U.S.C.A. § 77e. Section 12(1) gives effect to § 5(a) by authorizing recovery in a civil action against "[a]ny person who—(1) offers or sells a security in violation of section 77e of this title . . . ." 15 U.S.C.A. § 77l (1).

elements to a prima facie case: (1) the sale or offer to sell securities; (2) the absence of a registration statement covering the securities; and (3) the use of the mails or facilities of interstate commerce in connection with the sale or offer. *Doran v. Petroleum Management Corp.*, 545 F.2d 893, 899 (5th Cir. 1977); *Lewis v. Walston & Co., Inc.*, 487 F.2d 617, 621 (5th Cir. 1973).

 Section 15 of the 1933 Act imposes liability on any person who "controls" a seller or offeror of unregistered securities.[7] *See* 15 U.S.C.A. 77o. The plaintiff's burden under § 15 is to establish control. *Hill York*, 448 F.2d at 694. The defendant can rebut a prima facie case of controlling person liability with evidence that he "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."[8] 15 U.S.C.A. § 77o; *see Hill York*, 448 F.2d at 695 n.22; *Safeway Portland Employees' Federal Credit Union v. Wagner & Co., Inc.*, 501 F.2d 1120, 1124 (9th Cir. 1974).

## B. The Private Offering Exemption

 Section 4(2) of the 1933 Act, 15 U.S.C.A. § 77d(2), exempts from the registration requirements "transactions by an issuer not involving any public offering."[9] The so-called private offering exemption is an affirmative defense which must be raised and proved by the defendant. *See, e. g., SEC v. Ralston Purina Co.*, 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953); *Doran*, 545 F.2d at 893; *Woolf v. S.D. Cohn & Co.*, 515 F.2d 591, 608–09 (5th Cir. 1975), *vacated and remanded on other grounds*, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976). Whether an offering is public or private is a question of fact which must be resolved in light of the particular circumstances of each case. *See Hill York*, 448 F.2d at 687.

There are four factors that we have found to be useful reference points in evaluating the character of a given offering:

1. The number of offerees and their relationship to each other and to the issuer.[10]

2. The number of units offered.

3. The size of the offering.

4. The manner of the offering.[11]

*SEC v. Continental Tobacco Co. of S.C.*, 463 F.2d 137, 158 (5th Cir. 1972).

 Although this test appears to emphasize quantitative factors, the ultimate issue in determining the availability of the private offering exemption is "whether the particular class of persons affected need the protection of the Act." *Id.* For this reason, we have held that the defendant must establish that each and every offeree either had the same information that would have

---

**7.** Section 15 of the 1933 Act provides in pertinent part:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . . 
15 U.S.C.A. § 77o.

**8.** The defendants seem to assume that the plaintiffs were required to prove that the controlling person knew or should have known of the facts forming the basis of the controlled person's liability. This is incorrect. In *Hill York Corp. v. American Int'l Franchises, Inc.*, 448 F.2d 680 695 n.22 (5th Cir. 1971), we stated that lack of knowledge is a special defense to controlling person liability which the defendant bears the burden of proving.

**9.** For a comprehensive list of writings on the private offering exemption, see *Woolf v. S.D. Cohn & Co.*, 515 F.2d 591, 608 n.11 (5th Cir. 1975), *vacated and remanded*, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976).

**10.** A small number of offerees indicates that the offering was private, while a large number indicates that it was public. But the number of offerees is not dispositive: "No particular numbers are prescribed. Anything from two to infinity may serve: perhaps even one . . ." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 125 n.11, 73 S.Ct. 981, 985 n.11, 97 L.Ed. 1494 (1953).

**11.** For example, "public advertising is incompatible with the claim of private offering." *Hill York*, 448 F.2d at 689.

been available in a registration statement or had access to such information.[12] *See SEC v. Spence & Green*, 612 F.2d 896, 902 (5th Cir. 1980); *Doran*, 545 F.2d at 903–04, 905–06.

## C. Richard Engelstad's Liability

Plaintiffs' case against Richard was based on his having sold them 50 shares of unregistered Amarillo Wranglers, Inc. stock and on his having been a controlling person with respect to the 5 shares purchased from O'Grady and the 5 shares purchased from Tuckness.

It is conceded that the second and third elements of a § 12(1) prima facie case are present in this case. The only issue, therefore, is whether Richard was a seller within the meaning of the statute.

Richard clearly was a seller in the ordinary sense of the word; he parted with title to 50 shares of stock in return for a sum of money. Nevertheless, he argues that this Circuit has held that one is not a seller unless his actions were a proximate cause of the sale. This argument was made at trial and accepted by the trial judge. The jury was asked, in Special Interrogatory No. 1, to decide whether the actions of Richard were a proximate cause of the sale:

Do you find from a preponderance of the evidence that the actions of the Engelstads were a proximate cause of the Swensons' purchase of the stock in question?

Answer for each of the Engelstads:

"His actions were a proximate cause"

or

"His actions were not a proximate cause"

Answer: RALPH ENGELSTAD:

RICHARD ENGELSTAD:

"PROXIMATE CAUSE" means that cause which, in a natural and continuous sequence, unbroken by any new and independent cause, produces an event, and without which cause such event would not have occurred; and in order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

In *Hill York Corp. v. American International Franchises, Inc.*, we were presented with the argument that § 12(1) does not reach persons other than those who actually part with title to securities. Declining to read § 12(1) as requiring privity between plaintiff and defendant, we held that the appropriate inquiry is whether " 'the injury to the plaintiff flow[ed] directly and proximately from the actions of this particular defendant.' " 448 F.2d at 693 (citing *Lennerth v. Mendenhall*, 234 F.Supp. 59, 65 (N.D. Ohio 1964)). Nowhere in *Hill York* did we so much as intimate that our adoption of a proximate cause test was meant to narrow the class of persons subject to liability under § 12(1). Rather, it is clear that our intent was to give a liberal construction to the word seller to comport with the remedial purposes of the 1933 Act. Our later opinion in *Lewis v. Walston & Co.* confirms that *Hill York* did not change the law with respect to those who actually part with title to securities. In *Lewis*, after noting that the defendant "was not a 'seller' in the most common sense of that word," 487 F.2d at 621, we stated:

That, however, is not conclusive under § 12(1), for the courts have recognized that *other parties* who participate in the negotiations of or arrangements for the sale of unregistered securities 'sell' those securities within the meaning of § 12(1). . . . In *Hill York*, this Court announced the test applied in this Circuit to

---

12. Evidence of the offerees' investment sophistication also is helpful. *See Doran v. Petroleum Management Corp.*, 545 F.2d 893, 902 n.10 (5th Cir. 1977). Lack of proof of investment sophistication, however, does not preclude a finding that the offer was private. *Id.* By the same token, proof of investment sophistication is of little value unless accompanied by evidence that the offerees had or had access to the information that would have been included in a registration statement. Id. at 902.

determine whether a *participant* in the arrangements for a sale 'sells' securities within the meaning of § 12(1).

*Id.* at 621–22 (emphasis added).

■ Today we make it clear that one who parts with title to securities in exchange for consideration is a seller for purposes of § 12(1). To such a person, the proximate cause test is inapplicable. Therefore, with respect to Richard, we conclude that the trial court erred in submitting Special Interrogatory No. 1 to the jury. With that issue resolved, it is clear that the Swensons established a prima facie case as to the 50 shares purchased from Richard.

As to those shares, Richard attempted to establish a private offering defense. The plaintiffs objected to submission of that issue to the jury, arguing that there was no evidence upon which the jury could find that the offering was private. The objection was overruled. The jury found that the offering was private. Plaintiffs' post-trial motion for judgment n.o.v. was denied. Having carefully considered the record, we conclude that the plaintiffs' motions should have been granted.

■ The record is devoid of any indication that the defense carried its burden of proving the number or identity of the offerees. There was evidence that Richard knew that the Swensons planned to raise money to purchase the stock by selling options to others. Any people who Richard knew would be purchasing from the Swensons would be offerees. *See Katz v. Amos Treat & Co.*, 411 F.2d 1046 (2d Cir. 1969). But the defense made no attempt to prove the number of people who were to buy from the Swensons or to identify them. The defendants' "failure to adduce any evidence regarding the number of offerees [is] fatal" to a private offering defense. *Doran*, 545 F.2d at 901, *see Continental Tobacco*, 463 F.2d at 161; *Henderson v. Hayden Stone Inc.*, 461 F.2d 1069, 1071–72 (5th Cir. 1972). We take note of another major flaw in the defense. The only evidence tending to show that the Swensons had the information that a registration statement would have contained, or access to the same, is that Cal Swenson, in his capacity as coach of the Wranglers, had access to the corporation's books and was shown these books during one of the negotiating sessions with Richard. The evidence does not establish, however, that these books contained all the information that Schedule A of the 1933 Act, 15 U.S.C.A. § 77aa, would have required a registration statement to contain. Even if they did, the exemption still would be unavailable because there was no proof that the people who had agreed to buy the Swensons' stock were given this information or had access to it.[13]

■ Analyzing the evidence, as we must, in the light most favorable to the defendant, *Boeing v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), we find that the court erred in submitting the private offering issue to the jury. As to the 50 shares purchased from Richard, the plaintiffs are entitled to a judgment as a matter of law.[14]

**13.** There is another aspect of the defense's presentation that causes us some concern. The private offering exemption is available only to "issuers." *See* 15 U.S.C.A. § 77d(2). Issuer is defined in § 2(4) of the Act as "every person who issues or proposes to issue any security. . . ." 15 U.S.C.A. § 77b(4). The term "issuer" is not synonymous with the term "seller." If Richard merely was a seller, rather than an issuer, *see Darwin v. Jess Hickey Oil Corp.*, 153 F.Supp. 667, 672 (N.D.Tex.1957) (private offering exemption not applicable to "secondary or private transactions"), it was error to submit the private offering issue to the jury. If so, Richard might have been entitled to the exemption contained in § 4(1) of the 1933 Act for "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C.A. § 77d(1). We do not decide these issues, however, because they were not raised at the trial.

**14.** As an alternative defense, the defendants claimed that the Swensons waived the protection of § 12(1) by going ahead with the transaction despite knowledge of misrepresentations and omissions made by the Engelstads. The waiver question was submitted to the jury. While waiver may have been relevant to the plaintiffs' § 10(b) and 10b–5 claims, it was not relevant to their § 12(1) claims. In *Meyers v. C & M Petroleum Producers, Inc.*, 476 F.2d 427, 429 (5th Cir.), *cert. denied*, 414 U.S. 829, 94 S.Ct. 56, 38 L.Ed.2d 64 (1973), we held that waiver is not an available defense in § 12(1) cases.

The jury found that Richard controlled Tuckness and O'Grady. In Special Interrogatory No. 9, the jury was asked whether Richard knew of omissions or misrepresentation in connection with the entire transaction. The jury answered that question in the negative. Relying on that answer, Richard argues that he established the defense of lack of "knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability of the controlled persons is alleged to exist." 15 U.S.C.A. § 77*o*. The defendant misreads the statute. Knowledge of omissions or misrepresentations is not an element of § 12(1) liability. The only facts that Richard had to know to be held liable as a controlling person were the three elements of a § 12(1) prima facie case outlined above. He does not deny knowledge of any of the facts. Therefore, the Swensons also are entitled to a judgment against Richard as to the 5 shares purchased from Tuckness and the 5 shares purchased from O'Grady.

### D. Ralph Engelstad's Liability

The § 12(1) and § 15 claims against Ralph require little discussion. The jury found that his actions were not a proximate cause of the sale. Because he was not a seller in the ordinary sense of the word, it was proper to submit the proximate cause issue to the jury. Nevertheless, the Swensons are entitled to a judgment against him as to the 50 shares sold by Richard. The jury found that Ralph controlled Richard. Ralph failed to carry the burden of proving lack of knowledge of the facts necessary to the controlled person's liability.

### IV. State Law Claims

The district court dismissed the Swensons' claims under the Texas Deceptive Trade Practices—Consumer Protection Act, Tex.Bus. & Com.Code Ann. tit. 2, § 17.50 (Vernon Supp.1980), finding that the statute does not protect purchasers of securities. We agree.

Section 17.50 grants a cause of action to any "consumer" who has been the victim of a deceptive trade practice. Section 17.45(4) defines "consumer" as follows: "an individual, partnership, corporation, or governmental entity who seeks or acquires by purchase or lease, any *goods* or services," Tex.Bus. & Com.Code Ann. tit. 2, § 17.45(4) (Vernon Supp.1980) (emphasis added). "Goods" are defined as "tangible chattels or real property purchased or leased for use." *Id.* § 17.45(1). The Swensons argue that stock certificates are "tangible chattels" as that term is used in § 17.45(1) and, therefore, that they are consumers entitled to maintain an action under § 17.50.

Apparently, no Texas court has as yet had the occasion to address this issue. The most persuasive authority we have been able to find is *Cowen v. First National Bank of Brownsville*, 94 Tex. 546, 63 S.W. 532 (1901). In *Cowen*, the issue was whether certificates of deposits were goods or chattels. Categorizing the certificates as " 'evidence of incorporeal rights,' " 63 S.W. at 533 (quoting Schouler, *Personal Property* § 11), the court held that they were not goods or chattels. 63 S.W. at 533. In so holding, the court noted, as other examples of incorporeal rights, " '[b]ills and notes, certificates of stock, [and] *registered securities.*' " *Id.* (quoting Schouler, *Personal Property* § 11) (emphasis added). Based on *Cowen*, we think it reasonable to assume that Texas Supreme Court would find that stock certificates are not covered by the Texas Deceptive Trade Practices—Consumer Protection Act. We therefore affirm the dismissal of the Swensons' state law claim against the Engelstads.

### V. Conclusion

We affirm the district court's order dismissing plaintiffs' state law claims. We also affirm the entry of judgment in favor of the defendants on the § 10(b) and Rule 10b–5 claims. As to Richard, we reverse the entry of judgment in his favor on the § 12(1) and § 15 claims, and remand for a determination of damages and entry of a judgment for the plaintiffs. As to Ralph,

we reverse that part of the judgment absolving him from liability under § 15 for Richard's sale of 50 shares of stock, and remand for a determination of damages and entry of a judgment for the plaintiffs.[15]

AFFIRMED in part; REVERSED in part; REMANDED in part.

15. In view of our holding, we need not reach the issues raised in connection with plaintiffs' § 12(2) claims.