James A. WEPRIN, et al., Plaintiffs,

v.

J. Chandler PETERSON, et al., Defendants.

PHOENIX FINANCIAL CORPORATION, et al., Cross–Plaintiffs,

v.

CAPITAL SUNBELT INVESTMENTS GROUP, INC., et al., Cross–Defendants.

Civ. A. No. 1:85–cv–4670–MHS.

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 18, 1988.

Emmet J. Bondurant, II and Jeffrey D. Horst, Bondurant, Mixson & Elmore, Atlanta, Ga., for plaintiffs.

Thomas J. Gallo, Harkleroad & Hermance, Atlanta, Ga., James Wiley McKenzie, Jr., Office of James Wiley McKenzie, Jr., Duluth, Ga., and John R. Bush, Bush, Ross, Gardner, Warren & Rudy, Tampa, Fla., for defendants.

ORDER

SHOOB, District Judge.

The instant litigation arises out of investments by plaintiffs in a limited partnership organized by Capital Sunbelt Investments Group, Inc. These investments were sold to plaintiffs by the Peterson defendants, who were their investment advisors.[1] Plaintiffs brought suit against the Peterson and Capital defendants alleging violations of federal and state securities laws as well as common law tort and contract principles.[2]

This case came on for trial on March 7, 1988. During the course of the jury trial, counsel for all parties stipulated that plain-

---

1. The "Peterson defendants" include J. Chandler Peterson, the Peterson Wealth Management Companies, Ryan Smith and Phoenix Financial Corporation.

2. Plaintiffs alleged violations of § 5 and § 12(1) of the 1933 Act, 15 U.S.C. §§ 77e and 77 *l* and § 5 of the Georgia Securities Act, O.C.G.A. §§ 10–5–5 and 10–5–12 (Supp.1984).

tiffs' claims and the Peterson defendants' crossclaims under Section 12(1) of the Securities Act of 1933, as amended (the "1933 Act"), and O.C.G.A. § 10–5–12(a)(1) (Supp. 1984) would be presented to the Court for determination.[3] A separate hearing on the non-jury issues was held on April 8, 1988. The Court has considered the evidence submitted at trial as well as that introduced at the hearing in deciding this issue.

The basis for plaintiffs' claim under Section 12(1) is the undisputed fact that the offering of limited partnership interests in Capital: Maple Leaf Estates, Ltd. was not registered under Section 5 of the 1933 Act.[4] Section 12(1) provides that any person who offers or sells a security in violation of Section 5 of the 1933 Act shall be liable to the person purchasing from him to recover the consideration paid for such security plus interest thereon. 15 U.S.C. § 77l(1). Section 5 provides, in pertinent part, that it shall be unlawful, unless a registration statement is in effect, to use the means or instruments of interstate commerce to sell such a security through the use of any prospectus or otherwise, or to carry such security for the purpose of delivery after sale. 15 U.S.C. § 77e.

Registration under Section 5 is not required if an issuer demonstrates either that it has complied with Regulation D (17 C.F.R. 230.501–506), promulgated by the Securities and Exchange Commission ("SEC"), or that the transaction did not involve a public offering within the meaning of Section 4(2) of the 1933 Act.

The initial issue to be decided by this Court, therefore, is whether the sale of limited partnership interests in Capital: Maple Leaf Estates, Ltd. was a transaction "... not involving any public offering." In other words, was the Capital: Maple Leaf Estates, Ltd. transaction a non-public offering? If it was public, the second issue is, did the defendants comply with Regulation D?

## I.

### · FINDINGS OF FACT

#### A. *The Capital Defendants*

Capital Sunbelt Investments Group, Inc. ("Group") is a Florida corporation which owns 100% of the common stock of Capital Sunbelt Investments, Inc. ("Investments").[5] Investments is a Florida corporation which was formed in August 1981. As of December 31, 1984, Investments had been the general partner and sponsor of approximately forty-five real estate limited partnerships. In virtually all instances, the limited partnerships sponsored by Investments were formed for the purpose of acquiring mobile home parks or recreational vehicle parks in the State of Florida. A typical structure for each real estate acquisition would involve the formation of two limited partnerships, designated as "A" and "B" side partnerships. The "A" side partnership would typically purchase the land underlying the mobile home park or recreational vehicle park. The "B" side partnership would typically purchase the

---

**3.** All other claims were submitted to the jury by special interrogatory.

**4.** Although plaintiffs also purchased unregistered limited partnership interests in Capital: Harbor Oaks, Ltd., the purchases were made in March 1984, more than one year prior to the filing of this action—December, 1986. Section 13 of the 1933 Act contains a one year statute of limitations for claims under Section 12(1). 15 U.S.C. § 77m. Therefore, plaintiffs' Capital: Harbor Oaks, Ltd. claim is barred as a matter of law. Moreover, plaintiffs have abandoned their

federal and state registration claims for the Capital: Harbor Oaks investment. (Tr. at 4–5.)

**5.** References to exhibits of the Peterson defendants in evidence will be indicated by "Def. Exh. __", references to plaintiffs' exhibits in evidence will be indicated by "Pl. Exh. __", and references to exhibits of the Capital defendants in evidence will be indicated by "Cap. Exh. __". References to the transcribed record of the hearing on the issue of liability of the defendants under Section 12(1) of the 1933 Act will be indicated by "Tr. at __". References to the transcribed record of the jury trial will be indicated by "J. Tr. at __".

park improvements and lease the land from the "A" side partnership.

Capital Sunbelt Securities, Inc. ("Securities") acted as selling agent for many of the real estate limited partnerships sponsored by Investments. None of the Peterson defendants are stockholders, officers or directors of Investments, Group or Securities and did not participate in the operation or management of these entities.

## B. *The Peterson Defendants*

Phoenix Financial Corporation ("Phoenix") is a corporation based in Atlanta, Georgia which operates as a broker-dealer. Phoenix acted as a selling agent with respect to the sales of at least four previous limited partnerships sponsored by Investments. Ryan B. Smith ("Smith") was employed in 1985 by The Peterson Wealth Management Company ("Peterson Wealth") and was a registered representative with Phoenix.

## C. *The Issuers*

In May 1985, Investments formed and sponsored two limited partnerships known as Capital: Maple Leaf Estates, Ltd., an "A" side partnership ("Capital: Maple Leaf"), and Maple Leaf Estates, Ltd., a "B" side partnership ("Maple Leaf").

Capital: Maple Leaf is a Florida limited partnership with its principal place of business in Lakeland, Florida. Capital: Maple Leaf was formed for the purpose of investing in a 285 acre tract of land in Charlotte County, Florida on which a mobile home park exists.

Maple Leaf is a Florida limited partnership with its principal place of business in Lakeland, Florida. Maple Leaf was formed for the purpose of purchasing and operating the existing mobile home park on the 285 acre tract of land in Charlotte County, Florida to be owned by Capital: Maple Leaf. Maple Leaf was to lease the land from Capital: Maple Leaf. Investments is the General Partner of Capital: Maple Leaf and Maple Leaf.

Pursuant to a Limited Offering Circular dated May 20, 1985, Capital: Maple Leaf offered for sale 3,385 units of limited partnership interests at a price of $1,000 per unit or a total of $3,385,000 (the "Capital: Maple Leaf Offering"). The Limited Offering Circular provided for a minimum purchase of 100 units valued at $100,000.

Pursuant to a Limited Offering Circular dated July 1, 1985, Maple Leaf offered for sale 3,650 units of Class A limited partnership interests at a price of $1,000 per unit or a total of $3,650,000 (the "Maple Leaf Offering"). The Limited Offering Circular provided for a minimum purchase of 100 units valued at $100,000.

The limited partnership interests offered and sold in the Capital: Maple Leaf and Maple Leaf Offerings were not registered under Section 5 of the 1933 Act nor under O.C.G.A. § 10–5–5. The Capital: Maple Leaf and Maple Leaf limited partnership interests were offered and sold in reliance on exemptions from the registration provisions of Section 5 of the 1933 Act and O.C.G.A. § 10–5–5.

Securities acted as managing underwriter for the Capital: Maple Leaf and Maple Leaf Offerings. Phoenix acted as a selling agent for the Capital: Maple Leaf Offering and as underwriter for the Maple Leaf Offering.

Phoenix and Securities kept daily logs reflecting the individuals and entities to whom they distributed copies of the Limited Offering Circulars for the Capital: Maple Leaf and Maple Leaf Offerings. (Def. Exh. 277; Cap. Exhs. 1; 2.) In addition, Phoenix maintained copies of correspondence which accompanied Limited Offering Circulars sent to offerees. (Def. Exh. 1066.) Of the 257 copies of the Capital: Maple Leaf Limited Offering Circular, two were sent to state agencies, two were sent back to the printer, five were sent to counsel for the issuer, Mike Canan, two were distributed for internal use by Dan McBride and Doug English and at least nine retained by Capital: Maple Leaf were not distributed. (Tr. at 80–81; Cap. Exh. 1.) One hundred five (105) copies were given to Phoenix, which distributed circu-

lars to 96 persons, excluding persons who received a copy for internal use. (Cap. Exh. 1 at 1, 5; Def. Exh. 277; Tr. at 27, 63–64.) Of the remaining 132 copies, an additional number were distributed internally or as specimens. (Tr. at 117.)

Of the 300 copies of the Maple Leaf Limited Offering Circular, two were sent to state agencies, two were sent to the accountants for Maple Leaf, one was sent back to the printer, five were distributed for internal use by Dan McBride and Doug English, six were sent to counsel for the issuer, Mike Canan, one was sent to the bonding company for the issuer, at least six were distributed as specimens and six or more retained by Maple Leaf were not distributed. Of the remaining 266 copies, 113 were given to Phoenix. (Tr. at 80–81, 105–06; Cap. Exh. 2.) Phoenix distributed circulars to 34 persons, excluding persons who received a copy for internal use. (Def. Exh. 1006; Tr. at 27.)

All offerees had a prior relationship with Phoenix or Securities. Before a Limited Offering Circular was sent to a prospective investor, Phoenix reviewed the individual's tax returns and financial statements, prepared cashflow statements, and consulted with him concerning his investment objective. All purchasers completed Subscription Agreements. Subscriptions were accepted only from persons who indicated on their Subscription Agreements that they were capable of evaluating the merits and bearing the risks of the prospective investments.

There were no seminars or meetings by which the general public was solicited to purchase interests in the Offerings. (Tr. at 25, 69, 80.) All of the Limited Offering Circulars were sent or delivered to specifically identified people. (Tr. at 22, 68, 80–81.) All offers and sales were made on a personal basis and preceded by a Limited Offering Circular. (Tr. 22–25, 79–80, 89–90, 114–16.) In addition, reasonable inquiries were made to assure that the pur-

chasers of the securities were not underwriters. Specifically, purchasers were required to state on the Subscription Agreements that they were acquiring the securities for their own accounts. Written disclosure was made to each purchaser that the securities were not registered and, therefore, could not be sold unless registered under the 1933 Act or unless an exemption from registration is available. (Def. Exhs. 279–350; 1006; 1012; Cap. Exhs. 3; 4.) Finally, the limited partnership agreements limited the transferability of the limited partnership interests. (Def. Exh. 1013.)

The first sale of interests in Capital: Maple Leaf occurred in late May 1985 and in Maple Leaf in or about August 1985. A Form D notifying the SEC of the initial sales was filed for both Capital: Maple Leaf and Maple Leaf Offerings. Both Offerings were abandoned in early October 1985.

Total proceeds of the Capital: Maple Leaf and Maple Leaf Offerings were $2,677,000 and $950,000, respectively. (Def. Exhs. 279–350; 1006; 1012; Cap. Exhs. 3; 4.) All proceeds of the Maple Leaf Offering were returned to investors, and forty-two percent (42%) of all proceeds from the Capital: Maple Leaf Offering were returned. There were 33 investors in the Capital: Maple Leaf Offering. (Def. Exhs. 278; 279–350; 1012; Cap. Exhs. 3; 4; Tr. at 48.) Of the 33 investors, 16 had a net worth in excess of $1 million. (Def. Exhs. 279–350; 1012; Cap. Exhs. 3; 4.) There were 13 investors in the Maple Leaf Offering, nine of whom had a net worth of over $1 million. (Def. Exhs. 1006; 1012; Tr. at 27, 30.)

No interim or post-sale filing was submitted to the SEC on a Form D on behalf of either Capital: Maple Leaf or Maple Leaf. Soon after the Offerings were abandoned, however, counsel for the issuers made a written report to the SEC and set forth the facts and circumstances of the Offerings and the reasons for their abandonment. (Def. Exh. 1067B;[6] 1009.)[7]

---

**6.** During the course of the hearing on the issue of liability under Section 12(1), both the Certificate of Compliance with the Exemption Filing Requirements issued by the Georgia Secretary

## II.

### CONCLUSIONS OF LAW

Section 5 of the 1933 Act provides, in pertinent part, that:

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. 77e(a).

Section 4(2) of the 1933 Act provides, in pertinent part, that:

The provisions of Section 77e of this title shall not apply to—

    \*    \*    \*    \*    \*    \*

(2) transactions by an issuer not involving any public Offering.

15 U.S.C. § 77d(2).

#### A. *Section 4(2)*

■ Section 4(2), 15 U.S.C. § 77d(2), provides an exemption from registration for "transactions by an issuer not involving any public offering." It is apparent that the Capital: Maple Leaf Offering was exempt from registration under Section 4(2). In *Doran v. Petroleum Management Corp.,* 545 F.2d 893, 900 (5th Cir.1977), the Court of Appeals for the Fifth Circuit artic-

ulated factors to be taken into consideration in determining whether the Section 4(2) exemption is available:

The relevant factors include the number of offerees and their relationship to each other and the issuer, the number of units offered, the size of the offering, and the manner of the offering. Consideration of these factors need not exhaust the inquiry, nor is one factor's weighing heavily in favor of the private status of the offering sufficient to ensure the availability of the exemption. Rather, these factors serve as guideposts to the court in attempting to determine whether subjecting the offering to registration requirements would further the purposes of the 1933 Act.

It is clear from the Court's statement that not any one of the cited factors, nor all of the factors, is important in and of itself. Rather, the factors are simply aids to be used in determining whether subjecting an Offering to registration would further the purposes of the 1933 Act.

The Court also noted that the purpose of the 1933 Act is "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *Doran,* 545 F.2d at 900, *quoting SEC v. Ralston Purina Co.,* 346 U.S. 119, 124, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953). The Court held that an offeree must have been furnished information about the issuer that a registration statement would have disclosed, or have had effective access to such information. *Doran,* 545 F.2d at 903. *See also Swenson v. Engelstad,* 626 F.2d 421, 425–26 (5th Cir. 1980).[8] While evidence of investor sophisti-

---

of State for the Capital: Maple Leaf Offering and a written report dated November 8, 1985 to Charles Harper of the Securities and Exchange Commission from counsel for the issuers were inadvertently marked as defendants' exhibit 1067. For ease of identification, the Certificate of Compliance will hereinafter be referred to as defendants' exhibit 1067A and the report as defendants' exhibit 1067B.

**7.** The written report has voluminous exhibits, only one of which was introduced at the hearing on the issue of liability under Section 12(1). Specifically, Defendants' Exhibit 1009, which was identified by John David Burkey as being Exhibit C referenced in the written report (Tr.

at 114), was introduced. Defendants' Exhibit 1009 sets forth the identity of investors in Capital: Maple Leaf, as well as the amount of their investments and amounts reimbursed. (Def. Exh. 1009.)

**8.** Plaintiffs have raised the issue of whether the financial statements included in the Limited Offering Circulars were the same as those that would have been supplied in a registration statement. If the securities had been registered, they would have been registered on Form S–18, which is used for offerings of up to $7,500,000. (Vol. 2) Fed.Sec.L.Rep. (CCH) ¶ 7303. Item

cation is helpful, lack of proof of investor sophistication does not preclude a finding that the offer was private. *Swenson,* 626 F.2d at 426 n. 12. The crux of the issue was set forth in *Mary S. Krech Trust v. Lakes Apartments,* 642 F.2d 98, 103 (5th Cir.1981).[9] The Court said:

> Stated otherwise, the ultimate test is did the offerees know or have a realistic opportunity to learn facts essential to an investment judgment.

Upon application of all these factors, it is clear that the Capital: Maple Leaf Offering was exempt from registration. All offerees were provided with a copy of a Limited Offering Circular which contained the same information as would have been available in a registration statement. Indeed, the jury in this action has expressly found that there were no material misrepresentations or omissions in the Limited Offering Circular. (Special Interrogatory to Jury.) Thus, investors were provided with all material information. In addition to being provided with all material information, the investors had access to whatever additional information they considered important. (Def. Exhs. 806 at 94; 805 at 108.) The Limited Offering Circular advised the investors that the General Partner would make available any additional information. Many of the investors were also represented by Phoenix, which had access to additional information and would provide it upon request to any investor.

Plaintiffs argue that defendants did not fully comply with the requirements of

§ 4(2) because the Limited Offering Circulars did not contain a more recent balance sheet or financial statement. But Dan McBride, in response to plaintiffs' questions, clearly stated that he could and would have prepared these statements if requested. Since § 4(2) requires only that the information be *available,* and since the vast majority of the relevant information was readily available in the Limited Offering Circular, defendants have fulfilled the requirements of § 4(2).

In addition, the limited number of offerees and the related nature of offerees serves to distinguish the offerees from the public. There were no more than 228 offerees and 3 purchasers of Capital: Maple Leaf, and fewer than 187 offerees and only 13 purchasers of Maple Leaf. (Def. Exhs. 277; 278; 279–350; 1012; 1006; 1066; Cap. Exhs. 3; 4.) Even if the Capital: Maple Leaf and Maple Leaf Offerings are viewed as one offering there were fewer than an aggregate of 415 offerees, since some offerees received Limited Offering Circulars for both Offerings and should not be counted twice. In addition, the offerees had a prior relationship with Phoenix or Securities.

Finally, the limited size of the Offerings, the manner in which the Offerings were sold, and the limitations on resales of the limited partnership interests establish that Capital: Maple Leaf was not a public offering. The total proceeds of the Capital: Maple Leaf and Maple Leaf Offerings were approximately $2,677,000 and $950,000, re-

---

21(h) of Form S–18 requires that registrants which are limited partnerships file only an audited balance sheet of the general partner for its most recent fiscal year, and this information was included in the Capital: Maple Leaf Limited Offering Circular. (Vol. 2) Fed.Sec.L.Rep. (CCH) ¶ 7303 at 6472.

In addition, no financial information was required to be included concerning the issuer partnerships. General federal securities laws principles and Regulation D provide that financial statements concerning an issuer must be provided only "to the extent material to an understanding of the issuer, its business, and the securities being offered. . . ." 17 C.F.R. 230.-502(b)(2)(i). Since the jury has already determined that there were no misrepresentations or omissions in the Limited Offering Circular (Spe-

cial Interrogatory to Jury), the absence of financial information concerning the newly formed limited partnerships was of no significance. *See* Release No. 33–6455, [Vol. I] Fed.Sec.L.Rep. (CCH) ¶ 2380 at 2637–8 and 9 (March 30, 1983) (An audited balance sheet of the issuer may not be material and, thus, not required where the issuer is a "limited partnership formed with minimal capitalization immediately prior to a Regulation D offering. . . .").

**9.** In this case, the Court of Appeals affirmed a judgment finding that an offering was exempt from registration pursuant to Rule 146. *Krech* is significant because the procedures followed by Prudential Bache in offering the limited partnership interests were similar to those implemented by Phoenix. 642 F.2d at 102–103.

spectively. As previously discussed, no general solicitation was made, and there was no general advertising. Each Limited Offering Circular was addressed to a specific person. There was no general distribution of the Limited Offering Circulars. Reasonable inquiries were made by the issuers, Phoenix and Securities, and assurances received from investors, to ensure that the purchasers were not acting as underwriters, and the limited partnership agreements limited transferability of the limited partnership interests.

### B. *Regulation D*

Regulation D promulgated by the SEC provides a "safe harbor" from the registration provisions of Section 5 of the 1933 Act. 17 C.F.R. § 230.500–506. It is a series of six rules designated 501–506 that establish three separate, distinct exemptions from the registration requirements of the 1933 Act. Rules 501–503 set forth general definitions, terms and conditions. The exemptions are contained in Rules 504–506. In summary, Regulation D sets forth the following terms and conditions:

a. An issuer must reasonably believe that there were no more than 35 purchasers, excluding "accredited investors." *See* Rule 501.

b. Neither the issuer nor anyone acting on its behalf shall offer or sell the securities by any form of general solicitation or general advertising. *See* Rule 502(c).

c. The issuer shall exercise reasonable care to assure that the purchasers of the securities are not underwriters—that is, are not acquiring the securities for the purpose of resale. *See* 502(d).

d. The issuer shall file certain forms with the SEC. *See* Rule 503.

During 1985, when the Capital: Maple Leaf and Maple Leaf Offerings occurred, Regulation D provided for the following filings:

The issuer shall file with the Commission five copies of a notice on Form D at the following times:

(1) No later than 15 days after the first sale of securities in an Offering under Regulation D;

(2) Every six months after the first sale of securities in an Offering under Regulation D, unless the final notice required by paragraph (a)(3) of this Rule has been filed; and

(3) No later than 30 days after the last sale of securities in an Offering under Regulation D.

Defendants argue, against plaintiffs' vehement denial, that they fulfilled all of the requirements of Regulation D. While the Court agrees that defendants substantially complied with Regulation D, it appears that strict compliance is required.[10] Therefore, the Offerings were not exempt under Regulation D. Because an explanation of the exemption provided is not necessary since the Court has already found that it was not a public offering, the Court will not elaborate on the issue.[11]

■ Although Regulation D can be considered as a statement clarifying and unifying the requirements for exemption under Section 4(2), however, *Krech*, 642 F.2d at 102, the failure to qualify under Regulation D does not create the presumption that an exemption under Section 4(2) is not avail-

---

**10.** In Release No. 33–6683 [1986–87 Transfer Binder Fed.Sec.L.Rep. (CCH) ¶ 84,054 at 88,405 (Jan. 6, 1987), the SEC asked for comments on amending Regulation D to require only substantial or good faith compliance with Regulation D so that, in situations such as the one at hand, parties will not lose the protection of Regulation D due to inadvertent or immaterial omissions. *See also, Tabby's International, Inc. v. Securities and Exchange Commission*, 479 F.2d 1080 (5th Cir.1973).

**11.** The Court notes, however, that technical application of Regulation D in this instance would be inequitable because the final form D was not

necessary for investor protection and, in any event, the letter sent by defendants to the Securities Exchange Commission detailing the circumstances surrounding the failure of the deal served the same purpose as the filing. The SEC has since eliminated the requirement of a final filing. *See* Release No. 33–6663 [1986–87 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 84,032 (October 2, 1986). This provision should be applied retroactively. *See Villa Garcia v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 833 F.2d 545 (5th Cir.1987); *Adrian v. Smith Barney, Harris, Upham & Co.*, 841 F.2d 1059 (11th Cir. 1988).

able. *See* Preliminary Note 3 to Regulation D. *See also* Release No. 33–6389, [1981–82 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 83,106 at 84,910 (March 8, 1982).

In light of these facts, there is no practical need for the application of Section 5 of the 1933 Act to the Offering of limited partnership interests in Capital: Maple Leaf. In addition, a certificate issued by the Office of the Secretary of State of Georgia established that the Offering was exempt from the registration requirements of O.C.G.A. § 10–5–5. (Def. Exhs. 271.)

## CONCLUSION

In summary, this Court finds that the Capital: Maple Leaf Offering was exempt from the registration provisions of Section 5 of the 1933 Act and O.C.G.A. § 10–5–5. Accordingly, a judgment shall be rendered in favor of defendants and against plaintiffs on the claim under Section 12(1) of the 1933 Act and O.C.G.A. § 10–5–12(a)(1).

IT IS SO ORDERED.