**James E. MARK, et al.,
Plaintiffs–Appellants,**

v.

**FSC SECURITIES CORPORATION, et al., Defendants–Appellees.**

No. 87–4082.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 7, 1988.

Decided March 16, 1989.

James B. Helmer, Jr., Virginia Conlan Whitman, John L. Campbell (Lead) (argued), Walker, Chatfield & Doan, Cincinnati, Ohio, for plaintiffs-appellants.

Jerome Randolph (argued), James Burke, Keating, Muething & Klekamp, Cincinnati, Ohio, for defendants-appellees.

Before WELLFORD and BOGGS, Circuit Judges; and SIMPSON, District Judge.[*]

SIMPSON, District Judge.

This is an appeal from a jury's determination that a limited-partnership interest appellants purchased was exempt from Ohio securities-registration requirements. We reverse and remand for further proceedings.

## I.

In 1984, IBC Arabian Investments, Inc., A.T. McColgan, Jr., and Laurence C. Leafer, (collectively "IBC") as "General Partner," issued for sale limited-partnership interests in Malaga Arabian Limited Partnership. The Malaga limited-partnership offering was one in a series of limited partnerships IBC issued to solicit investors in the then-lucrative Spanish Arabian horse industry. Various broker-dealers, all members of the National Association of Securities Dealers, Inc., sold the Malaga limited-partnership interests. Appellees, Financial Services Corp. and its wholly-owned subsidiary, FSC Securities Corp. (collectively "FSC"), are the broker-dealers that sold the partnership interest to the Marks, appellants in this action. Significantly, Mrs. Mark was employed by FSC as a registered representative and made the sale to herself and her husband.

The total sale price, including interest, was $66,552.00. Payment consisted of a down payment of $6,500.00, and promissory notes that came due on June 1, 1985, 1986 and 1987. Out of the total sale price, FSC was to receive a 2% due-diligence fee, and the sales representative, Mrs. Mark, was to receive a commission of approximately 8%. The Marks allege that cash payments made and the balance due on the promissory notes now total $67,837.00; however, at the time of trial, the Marks had not paid the $16,000.00 installment due June 1, 1986, nor the $18,882.00 installment due June 1, 1987.

In their class action complaint, in addition to various securities fraud claims, the Marks sought to rescind their purchase of the Malaga limited-partnership interest pursuant to § 12(1) of the Securities Act of 1933, 15 U.S.C. § 77l(1), on the grounds that the transaction violated the registration requirements of 15 U.S.C. § 77e. The Marks also stated a claim for rescission and refund of the purchase price pursuant to the analogous provisions of Ohio's Blue Sky Law, Ohio Rev.Code § 1707.43. While Mr. and Mrs. Mark sought to proceed as class representatives, only two other of the twenty-eight purchasers sought to intervene. These other plaintiffs, James Smith of Texas and Kitty Malone of California, have withdrawn their appeal. (Appellants' brief at 3.)

At trial, the district court concluded that the Marks' rescission claim under § 12(1) of the 1933 Act was barred by the applicable one-year statute of limitations, 15 U.S.C. § 77m, and directed a verdict for FSC on that issue (Tr. at 533–42; 644). The jury

---

[*] The Honorable Charles R. Simpson III, United States District Judge for the Western District of Kentucky, sitting by designation.

returned a verdict in favor of FSC on all the remaining claims. The Marks' motions for judgment notwithstanding the verdict and for a new trial were subsequently denied.

On appeal, the Marks claim that the evidence was insufficient to support the jury's verdict that the Malaga offering was exempt from registration under Ohio's Blue Sky Law. If reasonable minds could differ as to what conclusions can be drawn from the evidence, when it is viewed in the light most favorable to FSC, the evidence is sufficient to establish an exemption under applicable law, and the jury's verdict must stand. *Calhoun v. Baylor,* 646 F.2d 1158, 1160 (6th Cir.1981). Conversely, if the evidence failed to prove the facts necessary to establish FSC's right to the exemption, then the verdict must be overturned. *Id.* A scintilla of evidence is not enough to sustain a verdict against a j.n.o.v. motion. *Chappell v. GTE Products Corp.,* 803 F.2d 261, 265 (6th Cir.1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987). We conclude that the evidence does not satisfy the requirements for exemption under § 4(2) of the 1933 Act or under the applicable securities regulation. Accordingly, we conclude that FSC did not meet its burden of proof to show the securities were exempt from registration under Ohio law.[1] The Marks are thus entitled to a judgment notwithstanding the verdict, *Chappell,* 803 F.2d at 265, and to the remedies available under Ohio law.[2]

## II.

Section 4(2) of the Securities Act of 1933, 15 U.S.C. § 77d(2), exempts from registration with the Securities and Exchange Commission "transactions by an issuer not involving any public offering." Although not defined in the Act, a "non-public offering" is

> [a]n offering to those who are shown to be able to fend for themselves.... The focus of inquiry should be on the need of the offerees for the protections afforded by registration.

*SEC v. Ralston Purina Co.,* 346 U.S. 119, 125, 127, 73 S.Ct. 981, 984, 985, 97 L.Ed. 1494 (1953).

Unless a seller establishes that the offering was not a public offering, then the seller is liable for sale of an unregistered security. Ohio Rev.Code § 1707.43; § 1707.44. The burden of proof is on the party claiming the benefit of the exemption, in this case, FSC. Ohio Rev.Code § 1707.45; *Swenson v. Engelstad,* 626 F.2d 421, 427 (5th Cir.1980); *Chapman v. Dunn,* 414 F.2d 153, 159 (6th Cir.1969).

There are no hard and fast rules for determining whether a securities offering is exempt from registration under the general language of § 4(2). However, several factors are significant: (a) the number of offerees; (b) the manner of the offering; (c) the number of units offered; (d) the relationship of the offerees to each other and to the issuer; and (e) the size of the offering. *Knapp v. Kinsey,* 249 F.2d 797, 801 (6th Cir.1957), *cert. denied,* 356 U.S. 935, 936, 78 S.Ct. 778, 795, 2 L.Ed.2d 810, 812 (1958); *Doran v. Petroleum Management Corp.,* 545 F.2d 893, 900–04 (5th Cir. 1977). Based on consideration of those factors, only one conclusion is, in this case, reasonable: The Malaga limited-partnership offering was not exempt under § 4(2).

---

1. The state-law exemption issue is governed by the Securities Act of 1933, which is expressly adopted by Ohio at Ohio Rev.Code § 1707.03(Q)(1): "The sale of any security is exempt [from registration with the Ohio Division of Securities] if all the following conditions are satisfied: (1) The provisions of Section 5 of the Securities Act of 1933 [15 U.S.C. § 77e] do not apply to the sale by reason of an exemption under either Section 4(2) of that act or any rule of the securities and exchange commission made to carry out Section 4(2) of that act in effect at the time of such sale."

2. The sale to the Marks took place on September 18, 1984. The Marks filed their complaint less than two years later, on July 23, 1986. The statute of limitations applicable to the state rescission claim is two years: "No action ... shall be brought more than two years after the plaintiff knew ... of the facts by reason of which the actions ... were unlawful...." Ohio Rev.Code § 1707.43.

In the present case, FSC argues it was not required to offer evidence about every person to whom the Malaga limited-partnership interests were offered. At trial, FSC offered no evidence as to the actual *number* of offerees, let alone their individual characteristics. That failure by itself may be fatal to FSC's claimed exemption under § 4(2). *Doran,* 545 F.2d at 901; *SEC v. Continental Tobacco Co.,* 463 F.2d 137, 161 (5th Cir.1972); *Henderson v. Hayden, Stone, Inc.,* 461 F.2d 1069, 1071–72 (5th Cir.1972). Moreover, the evidence as to the manner of the offering showed that numerous broker-dealers undertook to sell interests in the Malaga offering. In documents filed with the SEC, IBC listed four separate broker-dealers authorized to sell the Malaga offering in eleven different states. (Defense Exhibit 266 at 8). At trial, a representative of a fifth broker-dealer who sold the Malaga offering testified that "somewhere between ten and twenty" broker-dealers undertook to sell Malaga limited-partnership interests. (Tr. at 741). As for the number of units offered, the "copy numbers" on the plaintiffs' "Receipt for Private Placement Offering Memorandum" were 135, 274, and 447, suggesting the broker-dealers distributed the "Offering Memorandum" for the Malaga offering to many more than the ultimate twenty-eight purchasers. (Defense Exhibit 293, 294, 295).

■ These factors, taken together, indicate a wide-ranging sales effort and suggest a public, rather than a private, offering. *SEC v. Murphy,* 626 F.2d 633, 645–47 (9th Cir.1980); *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 687–91 (5th Cir.1971). Once such a wide-ranging distribution scheme is undertaken, evidence that each and every offeree had access to enough relevant information so as to make registration unnecessary is required to rebut the public offering inference. *Doran,* 545 F.2d at 903; *Swenson v. Engelstad,* 626 F.2d at 425. For example, if there is some special, close relationship between the offerees and the issuer, then there may be access to the sort of information that registration would disclose. *Ralston Purina,* 346 U.S. at 126, 73

S.Ct. at 985. But in this case, there was no evidence that any of the offerees had any relationship to the issuer, or to the Arabian horse industry. Instead, the list of twenty-eight purchasers show they were a diverse, unrelated group who resided in many different communities in twelve different states. (Defense Exhibit 404). That the purchasers are so diverse suggests the offerees were likewise diverse and unrelated, militating against a "private offering." *Hill York Corp.,* 448 F.2d at 688, 691. Without evidence that *all* those offerees had information enabling them to "fend for themselves," FSC did not sustain its burden of showing a § 4(2) exemption. *Ralston Purina; SEC v. Murphy,* 626 F.2d at 647; *Hill York Corp.,* 448 F.2d at 680; *Swenson v. Engelstad,* 626 F.2d at 427. Evidence that the individual plaintiffs had substantial investment experience is simply not sufficient to justify an exemption under § 4(2). *Lively v. Hirschfeld,* 440 F.2d 631, 633 (10th Cir.1971).

In sum,

... there is no evidence as to the experience of the buyers other than the plaintiffs. And there is no evidence as to how many offers were made to other persons, or the experience of those persons. The defendants did not testify that they had made no other offers. Without such evidence in the record the Court cannot determine whether the class needed protection. It was incumbent on the defendants to submit this evidence. Since they did not, they must suffer the consequences.

*Hill York Corp.,* 448 F.2d at 691 (quoting *Repass v. Rees,* 174 F.Supp. 898, 904 (D.Colo.1959)).

■ Even if, as we conclude, FSC failed to sustain its burden of proving an exemption under the subjective test of § 4(2), the "safe harbor" provision of Regulation D, 17 C.F.R. § 230.506, deems certain transactions to be "not involving any public offering" within the meaning of § 4(2) of the 1933 Act. In order to fall within the protection of this safe harbor, however, FSC had to prove that certain objective tests were met. These conditions include the

general conditions set forth in 17 C.F.R. §§ 230.501 through 230.503, not in dispute here, and the following "specific" conditions:

(i) *Limitation on number of purchasers.* The issuer shall reasonably believe that there are no more than thirty-five purchasers of securities from the issuer in any offering under this Section.

(ii) *Nature of purchasers.* The issuer shall reasonably believe immediately prior to making any sale that each purchaser who is not an accredited investor either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment.

Rule 506, Regulation D, 17 C.F.R. § 230.506.

"The term 'issuer' means every person who issues or proposes to issue any security," according to 15 U.S.C. § 77b(4), expressly adopted in 17 C.F.R. § 230.501(g). In this case, we take the issuer to be the "General Partner," consisting of IBC, Leafer, and McColgan, who had managerial responsibility for success or failure of the enterprise. *SEC v. Murphy*, 626 F.2d 633, 642–44 (9th Cir.1980).

In order to come within the Rule 506 safe harbor, FSC is required to offer evidence of the issuer's reasonable belief as to the nature of *each* purchaser. Thus, for purposes of Rule 506, what IBC, Leafer and McColgan knew and reasonably believed about each purchaser is critical. FSC argues that the evidence concerning sales procedures to be followed was sufficient to establish the issuer's reasonable belief, so as to warrant the Rule 506 exemption. On careful review, we conclude that it was not.

The only testimony at trial competent to establish the issuer's belief as to the nature of the purchasers was that of Laurence Leafer, a General Partner in Malaga. By his own admission, he had no knowledge about any purchaser, much less any belief, reasonable or not, as to the purchasers'

knowledge and experience in financial and business matters, as required by Rule 506.

Q. I want to ask you just a few things about securities. I know you testified that you aren't responsible for Blue Sky filing of these partnerships. Were these, was the Malaga partnership, were any of the partnerships that you were associated with at IBC registered with the Securities and Exchange Commission?

A. No, they were not.

Q. Were any of the securities which you sold registered with the Ohio Division of Securities?

A. They were not.

Q. What was done, how were these securities sold in order, since they were not registered?

A. They were sold under federal and state exemptions from registration.

Q. Am I correct that, in order to sell under a federal exemption, that it's necessary to ensure that the investors are qualified investors, and able to determine the risks of the investment?

A. They should be reasonably sophisticated.

Q. What was done to determine, or do you have any information regarding what was done to determine if investors were, in fact, reasonably sophisticated?

A. Well, there were two things. Number one, we had investor suitability standards that had to be met. You had to have a certain income, be in a certain tax bracket, this kind of thing. Then in the subscription documents themselves, they, when they sign it, they supposedly represented that they had received information necessary to make an informed investment decision, and that they were sophisticated. And if they were not, they relied on an offering representative who was, things of that nature.

Q. Did you review the subscription documents that came in for the Malaga offering?

A. No.

Q. You had left by that time, had you not?

A. Yes.

Q. So you, do you know whether all of the investors in the Malaga offering met the suitability and sophistication requirements?

A. I don't.

(Tr. at 241–42).

Similarly, the only other witness that defendants offered on the issue was Christopher J. Moran, an attorney once employed by FSC, who acted as a go-between for IBC and FSC. Moran actually represented IBC as securities counsel at the time the Malaga offering was made. Moran had general knowledge of the information assembled for distribution to Malaga purchasers, and of the general procedures which were supposed to be followed in every transaction. However, he admitted on voir dire by the trial judge:

Q. Do you have any personal acquaintance of any of the purchasers of the Malaga partnership?

A. No. Your Honor, I do not.

Q. You have no way of determining their level of sophistication in investments?

A. No, Your Honor, I would not. The only thing I could say on that, Your Honor, not to speak out of turn, is that there is a subscription agreement and suitability letter to be used in connection with the book that required the potential investor to basically certify that sophisticated—that he has received and under the memo, and that he is obviously sophisticated.

Q. You have no independent knowledge of whether, in fact, anyone is sufficiently sophisticated?

A. No, Your Honor, I do not.

(Tr. at 561–62).

Moran's testimony before the jury was as follows:

Q. Let me just ask two final questions, if you would. A broker—did you review the subscription, the signed subscription documents for every investor that invested in the Malaga partnership?

A. No, sir. I reviewed signed subscription documents from no investors.

Q. So you don't know whether, in fact, he ever, the investor, actually signed a subscription document?

A. No, sir, I never saw any of the subscription documents or any of the other closing documents.

(Tr. at 628).

No reasonable juror could determine from either witnesses' testimony what the issuer actually believed about the nature of each purchaser. The testimony neither establishes that the issuer had the requisite belief concerning the number and nature of the purchasers, nor does it provide a basis for a jury to decide whether any such belief was reasonable.

FSC also offered as evidence plaintiffs' executed subscription documents, as well as a set of documents in blank, to establish the procedure it followed in the Malaga sales offering. The subscription documents included a "suitability letter" in which the purchaser was required to warrant, among other things, that his or her income met the conditions set by IBC, that the purchaser had an opportunity to request and examine supplemental information, and that the purchaser had sufficient knowledge and experience in business affairs to enable the purchaser to evaluate the risks of the investment. The subscription documents also included an "Offeree Questionnaire" in which the purchaser was to set forth his or her educational and investment background, in addition to information as to whether the purchaser was represented by an attorney or an accountant. Presumably, this Offeree Questionnaire was included to enable the issuer to make an independent judgment of the purchaser's qualifications.

Although the plaintiffs' executed subscription documents, along with their testimony, may have been sufficient to establish the reasonableness of any belief the issuer may have had as to the plaintiffs' particular qualifications, that does not satisfy the burden of proof imposed by Rule 506 of Regulation D. That burden could

have been met by offering each of the twenty-eight purchasers' executed subscription documents into evidence for the jury to examine; then the jury might have determined what the issuer reasonably believed. The burden of proof might also have been satisfied if any IBC representative had testified that Malaga limited-partnership interests were sold *only* to persons whose offeree questionnaires indicated they qualified as the sort of purchasers contemplated by Rule 506. *See e.g., Mary S. Krech Trust v. Lake Apartments, Ltd.,* 642 F.2d 98, 103 (5th Cir.1981) (testimony that *only* persons deemed qualified by the issuer's vice-president were given offers justified private offering exemption under 17 C.F.R. § 230.146[d], the predecessor to Rule 506).

However, in the case *sub judice*, the documents offered no evidence from which a jury could conclude the issuer reasonably believed each purchaser was suitable so as to warrant a Rule 506 exemption. Instead, all that was proved was the sale of twenty-eight limited partnerships, and the circumstances under which those sales were *intended* to have been made. The mere fact that the limited-partnership interests were sold cannot support a conclusion that they were sold in compliance with the conditions contemplated by Rule 506. The blank subscription document and offeree questionnaire simply do not amount to probative evidence, when it is the answers and information received *from* purchasers that determines whether the conditions of Rule 506 have been met. Because there was no evidence from which a jury could conclude that the issuer had the requisite belief, nor from which a jury could determine the reasonableness of any such belief, FSC has failed to sustain its burden of proving an exemption under Rule 506 of Regulation D.

Having concluded that the Malaga limited-partnership offering did not meet the registration exemption requirement of either § 4(2) or Rule 506 of Regulation D, we conclude that the Marks are entitled to remedies available under Ohio law.[3] Under Ohio law

> every person who has participated or aided the seller in any way in making [a sale in violation of Chapter 1707] ... [is] jointly and severally liable to such purchaser ... for the full amount paid by such purchaser and for all taxable court costs, unless the court determines that the violation did not materially affect the protection contemplated by the violated provision.

Ohio Rev.Code § 1707.43.

As a matter of law, the failure to register the Malaga limited-partnership offering "materially affected the protection contemplated" by the exemption and registration requirements. *Pencheff v. Adams,* 5 Ohio St.3d 153, 449 N.E.2d 1277 (1983); *Roger v. Lehman Bros. Kuhn Loeb, Inc.,* 621 F.Supp. 114, 118 (S.D.Ohio 1985). Rescission of the sale of the Marks' limited-partnership interest is therefore required. The district court must determine the recovery to which appellants are entitled. Accordingly, we REVERSE and REMAND for further proceedings consistent with this opinion.

---

**3.** Because Mrs. Mark actually represented FSC in the transaction she now seeks to rescind, equitable principles might preclude recovery. Whether Mrs. Mark was in any way responsible for any of the failures of defendants under the federal or state acts, or whether she might be subject to an *"in pari delicto"* defense, we do not decide. *See Pinter v. Dahl,* — U.S. —, 108 S.Ct. 2063, 2070–75, 100 L.Ed.2d 658 (1988). We also do not decide whether the equitable doctrine of rescission would require refund of any commission paid to Mrs. Mark for her efforts in selling any of the units involved, including the unit sold to her husband and herself. We leave these matters to the district court to determine on remand.