FAYE L. ROTH REVOCABLE TRUST, by and through its Trustee, et al., Plaintiffs,

v.

UBS PAINEWEBBER INC., PW Aspen Management, L.L.C. PW Fund Advisor, L.L.C. and Mark Advisors, et al., Defendant.

No. 02–22546–CIV.

United States District Court, S.D. Florida.

March 30, 2004.

Curtis Carlson, Esq., Payton & Carlson, P.A., Miami, FL, for Plaintiffs.

Brian Spector, Esq. Miami, FL, Jonathan Greenblatt, Esq., Neil Koslowe, Esq., Washington, D.C., for Mark Advisors, LLC.

John Quaranta, Esq., Thomas Tew, Esq., Miami, FL, Charles Gilman, Esq., Leonard Spivak, Esq., New York City, for UBS PaineWebber.

### ORDER GRANTING SUMMARY JUDGMENT

GOLD, District Judge.

**THIS CAUSE** is before the Court upon Defendant UBS PaineWebber, Inc.'s Motion for Summary Judgment (DE # 91, filed December 8, 2003) seeking to dismiss Plaintiffs' Second Amended Complaint (DE # 52, filed March 3, 2003). Plaintiffs filed their Response to Defendant's Motion

for Summary Judgment (DE # 107) on January 5, 2004. Defendant UBS Paine-Webber, Inc. (UBS or Defendant) filed its Reply (DE # 121) on January 20, 2004. Defendant Mark Advisors L.L.C. (Mark Advisors) also filed a Motion for Summary Judgment (DE # 97) on December 8, 2003, and Plaintiffs filed their Response (DE # 106) on January 5, 2004. Defendant Mark Advisors filed its Reply (DE # 118) on January 20, 2004. Finally, Plaintiffs filed a Motion for Class Certification (DE # 83, filed August 29, 2003). Defendant Mark Advisors filed its Opposition to the Motion (DE # 101) on December 22, 2003, and Defendant UBS filed its Opposition (DE # 103) on the same day. Plaintiffs filed their Reply (DE # 115) on January 9, 2004. The Court held oral argument regarding these Motions on January 30, 2004.[1] After the Oral Argument, Plaintiffs filed a Motion to Supplement Motion to Certify Class Action (DE # 133, filed February 24, 2004).

Upon review of the parties' arguments, the record, and the relevant statutes and case law, and for the reasons stated in this Order, Defendant UBS' Motion for Summary Judgment is GRANTED. Plaintiffs have not stated a claim for fraud pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77$l$. Specifically, I conclude that Defendants did not offer investment opportunities in the PW Aspen Fund ("Fund") through the use of a registered public offering, and therefore, as a matter of law, Plaintiffs cannot bring a Section 12(a)(2) claim in connection with their investments in the Fund.[2] Thus, it is unnecessary to reach Defendant Mark Advisor's Motion for Summary Judgment because regardless of whom the defendant is, Plaintiffs cannot allege violations of Section 12(a)(2) involving the offering at issue in this case. I do not enter final judgment, however, because I am allowing Plaintiffs the opportunity to amend their complaint to allege violations of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (Section 10(b)), and 17 C.F.R. § 240.10b–5 (Rule 10b–5). Plaintiffs have twenty days from the date of entry of this Order to amend their complaint, or ten days to file an immediate appeal with the Eleventh Circuit pursuant to the certification process described in 28 U.S.C. § 1292(b).[3] In the event that they choose the latter route, the twenty-day period within which they may file an Amended Complaint and the statute of limitations for bringing a Section 10(b) claim will be automatically stayed pending

1. The Court will use the designation "Transcript at" followed by the page number to cite to the transcript of the oral argument (DE 132, filed February 6, 2004).

2. This conclusion does not conflict with my previous Order on Defendants' Motions to Dismiss (DE # 66, filed July 1, 2003). In that Order, I denied dismissal despite Defendants' argument that Section 12(a)(2) does not apply to private offerings such as the offering at issue here. I emphasized, however, that I was not deciding whether Section 12(a)(2) applies to this offering; rather, I simply concluded that it was inappropriate to dismiss the 12(a)(2) claim at that stage of the proceedings. I stated, "Defendants have not met their burden of establishing that Plaintiffs are not entitled to any relief under any set of facts

that could be proved consistent with their allegations. The Court is not ruling in this Order on whether the underlying transaction in this case was public or private, or whether it or not it is exempted from § 12(a)(2) of the 1933 Act. The Court is merely concluding that it is inappropriate to dismiss Plaintiff's claim for failure to state a claim upon which relief may be granted at this stage of the proceedings. The Court notes that Defendants may raise their arguments once more on a subsequent Fed.R.Civ.P. 56 motion when the record in this case is further developed." (Order on Defendants' Motions to Dismiss at 12).

3. The parties stated during oral argument that they believe certification would be appropriate in this case. (Transcript at 49–51).

Eleventh Circuit review.[4] Because the Motion for Summary Judgment · is GRANTED, Plaintiffs' Motion for Class Certification and Plaintiffs' Motion to Supplement are DENIED AS MOOT.

### Jurisdiction

This Court has subject-matter jurisdiction pursuant to federal question jurisdiction, 28 U.S.C. § 1331, and diversity jurisdiction, § 1331.

### Factual Background [5]

Plaintiffs' sole claim in this action is that Defendants violated § 12(a)(2) [6] of the Securities Act of 1933 (the Securities Act or the Act or the 1933 Act) by making misrepresentations in the offering, and communications relating to the offering, through which they sold interests in the PW Aspen Fund. (Statement ¶ 1). UBS and Mark Advisors formed the Fund in 1999. (Plaintiff's Statement ¶ 5). Morris Mark, the sole member and President of Mark Advisors, was the portfolio manager of the Fund. (*Id.* at ¶ 2). Bruce Rudenberg, Plaintiffs' Financial Advisor or FA, represented that Mark would use hedging [7] strategies in his management of the Fund. (*Id.* at ¶¶ 17, 18).

The offering of investments in the Fund was not registered under the 1933 Act. (Statement ¶ 2; Brousseau Declaration Exh. 1, Plaintiffs' Response to Paine-Webber's Discovery Requests ("Plaintiff [sic] admit that Defendants did not file a registration statement with the Securities and Exchange Commission in connection

---

4. The automatic stay of the twenty-day period to file an amended complaint and the statute of limitations period for filing a Section 10(b) claim resolves the concerns Plaintiffs raised during oral argument. *See* Transcript at 48–51. Plaintiffs' counsel stated that he would prefer to seek interlocutory review before amending the complaint to add a 10(b) claim as long as the statute of limitations period did not run while the Eleventh Circuit was deciding whether to grant certification and review the case. *Id.*

5. The Factual Background is derived from UBS' Statement of Material Facts ("Statement") (DE # 92, filed December 8, 2003). Plaintiffs filed a Local Rule 7.5 Statement of Material Facts in Opposition (Plaintiffs' Statement) (DE # 112, filed January 6, 2004), and Defendant filed its Reply (DE # 120) on January 20, 2004. Material factual inconsistencies will be noted.

The following is a description of the documents that have been filed in conjunction with the Motion for Summary Judgment. Defendant concurrently filed the declarations of Gregory Brousseau (DE # 93) and Charles A. Gilman (DE # 94) with its Motion for Summary Judgment. Plaintiffs filed the Affidavit of Jeffrey Roth (DE # 108, filed January 5, 2004) and an Appendix (DE # 110) to their Opposition to the Motion for Summary Judgment on the same day.

6. Section 12(a)(2) subjects an offeror or seller of a security to civil liability for including in the offering "an untrue statement of a material fact" or omitting "to state a material fact necessary to make the statements ... not misleading" in prospectuses or oral communications. 15 U.S.C. § 77*l*.

7. The parties have advanced various definitions of the terms "hedging" and "hedge fund." In Jeffrey Roth's deposition, he stated that Rudenberg told him that the PW Aspen Fund was a hedge fund, "meaning, in his words as he explained to me, that the manager of the fund would buy stocks long and short so that when the market went down, they would make money on short purchasing to offset losses on long purchasing." (Gilman Declaration (DE # 94) Exhibit 3, Jeffrey Roth Deposition at 29: 12–16). In the Second Amended Complaint, Plaintiffs state that "hedging is accomplished by selling short, which results in a profit when the value of what is sold short declines." (Second Amended Complaint ¶ 19). Defendant UBS does not offer a definition of hedging, but it suggests that a Fund that "remains fully invested on the long side" is not hedged. (Motion for Summary Judgment at 17). I note these definitions but do not use them to reach my conclusions. In other words, the definition of a hedge fund or hedging is not material to the resolution of Defendant UBS' Motion for Summary Judgment.

with their offering and sale of interests of PW Aspen Fund.")). The offering was made pursuant to materials referred to as a Confidential Offering Memorandum (COM). (Brousseau Declaration ¶ 11 and at Exhibit D). The COM reads as follows:

> The interests in PW Aspen Fund, L.L.C. (the "Fund") which are described in this Confidential Memorandum ("Memorandum") have not been and will not be registered under the Securities Act of 1933, as amended ("1933 Act"), or the securities laws of any of the States of the United States. The offering contemplated by this Memorandum will be made in reliance upon an exemption from the registration requirements of the 1933 Act for offers and sales of securities which do not involve any public offering, and analogous exemptions under state securities laws.

(Brousseau Declaration at Exhibit D). According to UBS' Statement of Material Facts, the offering and issuance of interests in the Fund was made pursuant to Rule 506 of Regulation D, 17 C.F.R. § 230.506.[8] (¶ 10, *citing* Brousseau Declaration Exh. N, Form D filed with the Securities and Exchange Commission (SEC) in 1999). The Investor Application included a section titled "Accredited Investor Representation," which reads as follows: "The Undersigned is an 'accredited investor' under Regulation D [generally, net worth in excess of $1 million for individuals (together with spouse) or total assets in excess of $5 million for entities]...." (Brousseau Declaration Exh. E,

Investor Application at 11 (brackets in original)). Further, UBS states that there were less than 35 "purchasers"[9] of interests in the PW Aspen Fund as the term is defined in SEC Regulation D. (Statement ¶ 16). Plaintiffs state that whether Defendants met the requirements of Regulation D are subject to dispute.[10] (Plaintiffs' Statement at 19, ¶ 8).

Beginning in February 2000, Plaintiffs received monthly brokerage account statements and semi-annual reports regarding the status of their investments in the Fund. (Statement ¶¶ 4, 6). They received quarterly letters beginning April 2000 (Statement ¶ 5). They also received offers to purchase their interests in the Fund on two separate occasions more than a year before they filed this action. (Statement ¶ 7). Many of these materials stated that Mark's investment strategy was to make long-term investments. (Brousseau Declaration Exh. F). In April 2002, Defendants arranged a conference call to give Plaintiffs the opportunity to ask Mark questions regarding the Fund. (Plaintiffs' Statement ¶ 12). Plaintiffs state that it was during this call that they first learned that Mark had not been managing the Fund in the manner in which they had been informed that he would. (*Id.* at ¶ 23). Accordingly, Plaintiffs brought this action, initially in state court, on August 9, 2002. (Statement ¶ 3).

### Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment

---

**8.** Regulation D exempts from registration certain offers and sales based on the number of purchasers and regardless of the dollar amount of the offering. 17 C.F.R. § 230.506. The rule does not limit the number of accredited investors. *Id.*

**9.** 17 C.F.R. § 230.506 limits offerings exempted under this rule to thirty five purchasers. It defines a "purchaser" as someone who is not

an accredited investor and who "either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment ...." 17 C.F.R. § 230.506.

**10.** Plaintiffs do not cite to the record to support this statement. Nor do they address this argument in their Opposition.

when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). The moving party has the burden to establish the absence of a genuine issue as to any material fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Tyson Foods, Inc.,* 121 F.3d at 646. Once the moving party has established the absence of a genuine issue of material fact, to which the nonmoving party bears the burden at trial, it is up to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Issues of fact are genuine only if a reasonable jury, considering the evidence presented could find for the nonmoving party. *See Anderson,* 477 U.S. at 247–51, 106 S.Ct. at 2510–11, 106 S.Ct. 2505. In determining whether to grant summary judgment, the district court must remember that, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.,* 477 U.S. at 255, 106 S.Ct. at 2513.

## Analysis

Upon review of the record, the parties' arguments, and applicable case law, I conclude that Plaintiffs' claim is not time-barred, but that Defendants are entitled to summary judgment as a matter of law because Section 12(a)(2) does not apply to type of offering at issue here. Thus, Plaintiffs cannot bring a Section 12(a)(2) claim against any of the Defendants for this offering. I am allowing Plaintiffs the opportunity to amend their Second Amended Complaint within twenty days to allege violations of Section 10(b) of the Securities Exchange Act. In the alternative, they can file an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) based on the issues I have indicated are appropriate for certification within ten days of the date of entry of this Order. *See infra* Part III for a discussion of 28 U.S.C. § 1292(b). If they decide to take the latter course, this case and the statute of limitations period for bringing a Section 10(b) claim will be automatically stayed pending Eleventh Circuit review.

## I. A Material Issue of Fact Remains Regarding the Statute of Limitations.

█ I first address Defendant UBS' argument that Plaintiffs' sole claim is time-barred because if UBS is correct, I need not reach the other issues in this case. Section 13 of the Act provides the statute of limitations for alleged violations of § 12(a)(2): "No action shall be maintained to enforce any liability created under section 77k or 77*l*(a)(2) of this title unless brought within one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence . . . ." 15 U.S.C. § 77m. Defendants argue that dismissal is warranted pursuant to this statute as to each of the Plaintiffs' principal allegations: that Defendants fraudulently represented that they would (1) hedge through short selling, (2) conservatively manage the Fund to minimize loss, and (3) engage in substantial portfolio diversification. (Motion at 13). UBS states that more than a year prior to commencing suit, Plaintiffs had knowledge, or

at least "inquiry notice" (*i.e.*, "knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed"), that each of these investment strategies did not occur. (Motion at 14, *citing Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir.2002); *Theoharous v. Fong*, 256 F.3d 1219 (11th Cir.2001)). Plaintiffs argue that they were not put on inquiry notice until the April 2002 conference call with Mark. Based on the record and applicable case law, I conclude that there is a material dispute as to whether Plaintiffs were on inquiry notice more than a year prior to filing suit. Accordingly, summary judgment on this ground is not warranted.

In the cases Defendant cites, the plaintiffs were put on inquiry notice because the allegedly concealed information was closely related to the information that was disclosed more than a year prior to filing suit. In *Franze*, the plaintiffs alleged that the defendant made misrepresentations in violations of securities laws when selling life insurance policies. *Franze*, 296 F.3d at 1252. Plaintiffs thought that they were buying pension, retirement, or education funding plans because Defendants' agents had allegedly obscured the nature of the costs under the policies, particularly the fact that these costs would increase as the investors' ages increased. *Id.* The court stated that to be placed on inquiry notice of securities fraud, an investor needs to have knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed. *Id.* at 1254, *citing Theoharous*, 256 F.3d at 1228. The court found that this standard had been met. *Id.* The defendant had provided the plaintiffs with a prospectus and policy prior to their purchases. *Id.* at 1255. These documents revealed that the insurance premiums increased over the policy period. *Id.* The Eleventh Circuit stated that for pur-

poses of inquiry notice, a plaintiff is deemed to have knowledge of the information contained in the offering. *Id.* Because the offering materials disclosed that the premiums increased, the plaintiffs could not argue that they did not have knowledge that the costs would increase as their ages increased. *Id.; see also Theoharous*, 256 F.3d 1219 (concluding that the securities claims regarding the defendant company's alleged misrepresentations of solid financial health were time-barred because the company's filing for bankruptcy more than a year prior to commencement of the action put the plaintiffs on inquiry notice).

These cases are distinguishable from the present action. Defendant argues in large part that the general decline in the value of Plaintiffs' investments was sufficient to put them on inquiry notice of the alleged misrepresentations. (*See, e.g.,* Motion at 18–19). Most of the allegations, however, do not state that Defendants misrepresented a drop in value, but that Defendants concealed changes in Mark's investment strategy. For example, Plaintiffs state that Defendants fraudulently represented that Mark would not invest more than 25% in any one industry (Second Amended Complaint ¶ 27) and that Mark would invest a minimum of $2 million in the Fund (Second Amended Complaint ¶ 28). In the cases Defendant cites, the information alleged to have been concealed related to the information disclosed; thus, the revealed information would have been sufficient to arouse the suspicion of a reasonable person. In *Franze*, the plaintiffs alleged that the defendant's agents fraudulently obscured the fact that the premiums would increase. *Franze*, 296 F.3d at 1252. The prospectus and related documents included a table showing that the premiums would increase. *Id.* at 1255. In *Theoharous*, the plaintiffs alleged that the defendant company fraudulently represented that it was experiencing solid financial health. *The-*

*oharous,* 256 F.3d at 1228. The company, however, filed for bankruptcy. *Id.* This event is clearly sufficient to put a reasonable person on notice that the company was not solid financially. In this case, the reports of plummeting values were sufficient to put Plaintiffs on notice that their investment was decreasing in value, but were not necessarily sufficient to put a reasonable person on notice that Mark had changed his investment strategy or that fraud had occurred. *See LaGrasta v. First Union Securities, Inc.,* 358 F.3d 840 (11th Cir.2004) (stating that a drop in an investment's value is not necessarily sufficient to place plaintiffs on inquiry notice of securities fraud).

In *LaGrasta,* the court reversed the district court's dismissal of the securities complaint as time-barred. *Id.* The district court had held that the plaintiffs were put on inquiry notice more than a year prior to filing suit because a significant drop in stock price had occurred. *Id.* at 846. The Eleventh Circuit acknowledged that a decline in value may be a relevant factor in arousing suspicion among investors but nonetheless "decline[d] the invitation to adopt a bright-line rule that a certain price drop within a certain period of time constitutes inquiry notice as a matter of law." *Id.* at 849. The court explained that "[t]here may be numerous reasons, other than fraud, for a stock to decline (even steeply) in price." *Id.* at 847 (parenthesis in original). Similarly, in this case, the decline in value does not necessarily indicate that Mark was not employing the investment strategies Plaintiffs understood him to be using. A reasonable person could attribute the decline to a variety of factors, such as normal fluctuations and declines in the financial market, other than fraud.

Defendant also argues that Plaintiffs were put on inquiry notice because they received materials disclosing that Mark was not engaging in hedging strategies, or short-term selling. UBS spends a considerable amount of time arguing that its various reports revealed that Mark's strategy was one of long-term investment, which is incompatible with what Plaintiffs understood as hedging. (Motion at 19–21). The Second Amended Complaint, however, includes other allegations that do not relate to hedging. As explained above, Plaintiffs state that Defendants fraudulently represented that Mark would not invest more than 25% in any one industry (Second Amended Complaint ¶ 27), and that Mark would invest a minimum of $2 million in the Fund (Second Amended Complaint ¶ 28). Defendant has failed to cite to specific sections of the record where its periodic reports and letters reveal information sufficient to put Plaintiffs on inquiry notice of each of these allegations. Even if Plaintiffs understood hedging to mean short term investment, and even if they knew that the Fund remained "fully invested on the long side" (Motion at 17), these facts would at most indicate that Plaintiffs were put on inquiry notice that Mark was not hedging. The revealed information is not necessarily sufficient to have placed Plaintiffs on inquiry notice regarding their remaining allegations. Accordingly, material issues of fact remain as to whether Plaintiffs were put on inquiry notice more than a year before filing suit, and therefore, summary judgment is not granted as to Defendant's statute-of-limitations argument.

## II. As a Matter of Law, Section 12(a)(2) Does Not Apply to the Offering.

Defendants are entitled to summary judgment based on UBS' remaining arguments. For the reasons stated below, I conclude that Plaintiffs cannot bring a Section 12(a)(2) claim for statements made in connection with the offering Defendants

used to solicit investments in the Fund. After outlining the parties' arguments, I will explain my conclusions.

## A. Parties' Arguments

Defendant argues that Plaintiffs cannot bring an action pursuant to Section 12(a)(2) because the statute only applies to registered offerings, and the offering of interests in the Fund was not registered. UBS bases its argument on *Gustafson v. Alloyd Co.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). Plaintiffs offer a limited view of *Gustafson*, and interpret the decision to mean simply that Section 12(a)(2) applies to all *public*, not private, offerings, regardless of whether they are registered. (Opposition at 41, *citing Gustafson*, 513 U.S. at 578, 115 S.Ct. at 1071). They further argue that Defendants' offering materials, though referred to as a Confidential Offering Memorandum (COM), "could not have been more public in nature, and therefore, Section 12(a)(2) applies." (*Id.*). They state, based on *Swenson v. Engelstad*, 626 F.2d 421 (5th Cir. 1980),[11] that the determination of whether an offering is public or private depends upon factors such as the number of offerees. (*Id.* at 43). They contend that Regulation D does not provide an exemption from Section 12(a)(2)'s anti-fraud provisions. (*Id.* at 42). Finally, they state in their Local Rule 7.5 Statement of Material Facts that whether Defendant met the requirements of Regulation D is in dispute although they do not cite to the record for support and do not argue this point in their brief. (Plaintiffs' Statement at 19, ¶ 8). Defendant argues that if Plaintiffs believe that the offering was improperly registered, they should have brought a claim under Section 12(a)(1)[12] instead of Section 12(a)(2).

## B. Plaintiffs cannot bring a Section 12(a)(2) claim against Defendants for offering interests in the PW Aspen Fund.

A key issue in this case is whether *Gustafson* limits Section 12(a)(2) liability to registered public offerings or whether a private placement memoranda (PPM) or COM can subject an offeror to Section 12(a)(2) liability. A second related issue regards the applicability of the *Swenson* case to this action. *Swenson*, 626 F.2d 421. In that case, the former Fifth Circuit identified factors a court should use to determine whether an offering needs to be registered for purposes of Section 12(a)(1) liability, not whether an offering is subject to Section 12(a)(2) fraud. *Id.* Further, *Swenson* was decided well before the Supreme Court decided *Gustafson* and the SEC promulgated Regulation D. Thus, the Fifth Circuit was not addressing the issues that confront me today: whether only registered offerings are subject to Section 12(a)(2) liability and whether compliance with Regulation D exempts parties from registration requirements and therefore renders Section 12(a)(2) inapplicable. I conclude that Regulation D does do so, as I will explain in Part II.B(2), *infra*.

The third issue for which there is no binding precedent is whether a cause of action for improperly failing to register an offering lies under Section 12(a)(2). Al-

11. The Eleventh Circuit adopted as binding precedent all cases decided by the former Fifth Circuit prior to the close of business on September 30, 1981. *See Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

12. Section 12(a)(1) provides, in relevant part, "any person who—(1) offers or sells a security in violation of section 77e [the registration provision] of this title ... shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77*l*(a)(1).

though Plaintiffs did not argue this point in their brief or during oral argument, they state in their Local Rule 7.5 Statement that whether Defendant complied with Regulation D is subject to dispute. To the extent that they are claiming that Defendants should have registered the offering, I conclude that this claim does not lie under Section 12(a)(2), but under Section 12(a)(1), which allows a party to bring an action against an offeror or seller for noncompliance with regulation requirements. 15 U.S.C. § 77l(1); *see infra* Part II.B(3). Further, a review of the record reveals that there is no material dispute that UBS did comply with Regulation D. *See infra* Part II.B(4). Thus, even if a cause of action for noncompliance with registration requirements did exist under Section 12(a)(2), summary judgment for Defendant would still be warranted.

I will discuss each of my conclusions: first, Section 12(a)(2) only applies to registered offerings; second, *Swenson* does not apply to this case; third, a cause of action for violating registration requirements does not lie under Section 12(a)(2); and fourth, even if Section 12(a)(2) applied to claims for noncompliance with registration requirements, there is no dispute that the offering in this case complied with Regulation D. These conclusions lead me to grant summary judgment for Defendants.

### (1) Section 12(a)(2) Only Applies to Registered Offerings, so Whether an Unregistered Offering Is Public in Nature Is Irrelevant.

■ The parties do not dispute that the offering of interests in the Fund was not registered. (Statement ¶ 2). Thus, this issue involves a question of law: whether Section 12(a)(2) applies to unregistered offerings. I conclude, based on the *Gustafson* decision and cases and commentary

that have interpreted this decision, that it does not.

In *Gustafson,* respondent companies, Alloyd Holdings and Wind Point Partners II, L.P., brought a Section 12(a)(2)[13] action against individual petitioners for alleged misrepresentations during the sale of Alloyd, Inc.'s stock to Wind Point through Alloyd Holdings. 513 U.S. at 564, 115 S.Ct. at 1064. Petitioners and Alloyd Holdings entered into a contract of sale to effect this transaction. *Id.* at 565, 115 S.Ct. at 1065. Prior to the transaction, Wind Point had conducted a review of Alloyd, Inc.'s finances and had relied on its year-end estimates of its own financials. *Id.* After the sale, however, the year-end audit of Alloyd, Inc. revealed that its actual earnings were lower than the estimates the parties had relied on in negotiating. *Id.* Respondents brought an action under Section 12(a)(2). *Id.* They alleged that Petitioners had made inaccurate statements regarding the financial status of their company. *Id.* at 565–566, 115 S.Ct. at 1065. The Supreme Court granted certiorari to examine the issue of whether Section 12(a)(2) applies to contracts of sale. *Id.*

The Court began its analysis by examining the language of the statute. In relevant part, the section provides that any person who

> offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were

---

**13.** At the time, Section 12(a)(2) was numbered Section 12(2).

made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

*Id.* at 567, 115 S.Ct. at 1066, *citing* 15 U.S.C. § 77*l*(2), now § 77*l*(a)(2). The Court stated that the courts of appeals agree that the term oral communication in the phrase "prospectus or oral communication" is restricted to those oral communications that relate to a prospectus. *Id.* at 568, 115 S.Ct. at 1066. Thus, the Court turned to the question of whether a contract of sale is a prospectus. *Id.* In analyzing this issue, the Court examined Section 10 of the Securities Act, which sets forth the information that must be contained in a prospectus. *Id.* Section 10 provides the following:

a prospectus relating to a security other than a security issued by a foreign government or political subdivision thereof, shall contain the information contained in the registration statement ...;

"(2) a prospectus relating to a security issued by a foreign government or political subdivision thereof shall contain the information contained in the registration statement ...."

*Id.* at 568–569, 115 S.Ct. at 1066, *citing* 15 U.S.C. § 77j(a). The Court concluded, based on this language, that "[s]ave for the explicit and well-defined exemptions for securities listed under § 3, see 15 U.S.C. § 77c (exempting certain classes of securi-

ties from the coverage of the Act), its mandate is unqualified: '[A] prospectus ... shall contain the information contained in the registration statement.'" *Id.* at 569, 115 S.Ct. at 1066. The Court stated that in the case before it, there was no dispute that the contract was not required to contain the information in the registration statement, and that a Section 3 statutory exemption did not apply. *Id.*, 115 S.Ct. at 1067. Thus, the Court concluded that because the contract at issue did not need to comply with Section 10's registration requirements, it was not a prospectus. *Id.* Further, because for the most part only public offerings require the preparation and filing of a registration statement, the Court concluded that it follows that a prospectus is confined to documents related to public offerings. *Id.*

The majority of courts addressing the issue have interpreted *Gustafson* to mean that an offering that is a private placement within the meaning of Section 4(2), which exempts from registration offerings that are not made to the public (15 U.S.C. § 77d(2)), is not a prospectus and is therefore not subject to Section 12(a)(2) liability. In other words, these cases state that an offering that is exempt from registration pursuant to Section 4(2) is not subject to Section 12(a)(2) liability. *See, e.g., In re Worldcom, Inc. Sec. Litig.,* 294 F.Supp.2d 431 (S.D.N.Y.2003) (dismissing Section 12(a)(2) because, despite the fact that there were hundreds of offerees, the court concluded that the offering was not made in connection with a public offering); *AIG Global Sec. Lending Corp. v. Banc of America Securities LLC,* 254 F.Supp.2d 373, 389 (S.D.N.Y.2003) (granting dismissal due to the fact that there was no legal or factual basis for plaintiffs' argument that *Gustafson* was distinguishable because the securities were sold pursuant to a "public style private offering."); *Kainos Labs., Inc. v. Beacon Diagnostics, Inc.,* Civ. No. 97–4618, 1998 WL 2016634, *5 (N.D.Cal.

Sept.14, 1998) ("The PPM alone cannot lay the basis for a claim brought under Section 12(a)(2) because it indicates in no uncertain terms that its use should be limited only to the recipient of the PPM."); *Vannest v. Sage, Rutty & Co., Inc.*, 960 F.Supp. 651 (W.D.N.Y.1997) (following the line of cases concluding that a PPM by definition is not a public offering within the meaning of Section 12(a)(2)); *Lennon v. Christoph*, Civ. No. 94–6152, 1996 U.S. Dist. LEXIS 9943, *52–*53 (N.D.Ill. July 12, 1996) (granting summary judgment to the defendants as to the Section 12(a)(2) claims because "[b]y definition, a private placement memorandum such as the one at issue here does not involve a public offer-

ing"); *In re JWP Inc. Sec. Litig.*, 928 F.Supp. 1239 (S.D.N.Y.1996) (holding that Section 12(a)(2) did not apply to a private placement memorandum which was subject to a Section 4(2) exemption); *Glamorgan Coal Corp. v. Ratner's Group*, Civ. No. 93–7581, 1995 WL 406167, *1 (S.D.N.Y. July 10, 1995) (concluding that a PPM cannot subject offerors to Section 12(a)(2) liability); *ESI Montgomery County v. Montenay Internat'l Corp.*, 899 F.Supp. 1061 (S.D.N.Y.1995) (concluding that because the plaintiff had acknowledged that the offering was made pursuant to a private placement memoranda exempt from registration by Section 4(2), an amended Section 12(a)(2) claim would be futile).[14]

14.  A majority of the commentary on the issue also supports this view. *See, e.g.*, Louis Loss & Joel Seligman, *Securities Regulation* 794 (3d ed.2003 supp.) ("Since § 12(a)(2) limits liability to sellers who make misrepresentations or omissions 'by means of a prospectus' the Supreme Court held [in *Gustafson*] that liability was limited to registered offerings by issuers and their controlling shareholders."); 2 Harold S. Bloomenthal, *Securities Law Handbook* § 26:14, at 1539 (2003) ("Section 12(a)(2) remains appropriate in connection with registered offerings ...."); Gary M. Brown, *Exemptions Under the Securities Act of 1933*, 1385 PLI/Corp. 217, 288 (2003) ("[T]here, in effect, is no effective private remedy under the '33 Act for fraud in connection with exempt transactions due to the United States Supreme Court's decision in *Gustafson v. Alloyd Company*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) limiting the applicability of Section 12(a)(2) of the '33 Act to public offerings."); Joseph McLaughlin, *The SEC's Coming Regulatory Retreat*, 1127 PLI/Corp. 185, 191 (1999) ("[U]nder *Gustafson* [private placements] are subject only to Rule 10b–5 liability ...."); Joseph Shade, *Financing Exploration: Requirements of Federal and States Securities Laws*, 37 Nat. Resources J. 749, 779 (1997) ("Prior to 1995, if there was fraud in cases involving issuer transactions, where the issuer sold securities in either an exempt or non-exempt transaction, remedies were available under Sections 11 or 12 of the 33 Act, which essentially impose strict liability .... In *Gustafson*, how-

ever, the U.S. Supreme Court for purposes of 12(2) liability, limited the meaning of 'prospectus' to documents that describe a public offering. From now on liability in cases involving fraud in connection with private placements will be founded on Rule 10(b)(5). The obvious intent of *Gustafson* was to make Rule 10b–5 (a scienter based standard) the norm for civil liability in private offerings, because under Gustafson, 12(2) now only applies to 'public' offerings.") (footnotes omitted); Stephen J. Chol, *Company Registration: Toward a Status–Based Antifraud Regime*, 64 U. Chi. L.Rev. 567, 571 n. 23 (1997) ("Companies going through a public offering potentially face antifraud liability under Sections 11 and 12(a)(2) of the Securities Act as well as under Rule 10b–5. Private placements, on the other hand, only must endure Rule 10b–5 antifraud liability.") (citations omitted); Christopher J. Mailander, *Searching for Liquidity: United States Exit Strategies for international Private Equity Investment*, 13 Am. U. Int'l L.Rev. 71, 92 (1997) ("[L]iability under section 12(2) of the Securities Act also has been held to apply only to registered offerings."), *citing Gustafson*, 513 U.S. at 584, 115 S.Ct. 1061; Krista R. Bowen, *A Cloudy Prospectus: The Supreme Court's Problematic Reasoning in Gustafson v. Alloyd Co.*, 53 Wash. & Lee L.Rev. 1041, 1095 (1996) ("[T]he *Gustafson* decision apparently removes transactions that are exempt under Section 4(2) from the coverage of Section 12(2)."); Kimberly D. Krawiec, *Gustafson v. Alloyd Co.:*

Several of the cited cases require further comment because, like this case, they involve an offering which was made pursuant to a COM or PPM, but which the plaintiffs argue was in essence a public offering that should be subject to Section 12(a)(2) liability. After discussing these cases, I will apply them to the instant action and explain why I conclude, as a majority of courts have, that Defendants' offering is a private placement not requiring a prospectus and therefore not subject to Section 12(a)(2) liability. In *In re JWP Inc. Sec. Litig.*, the defendants sought summary judgment on the securities claims that had been asserted against them. *In re JWP Inc. Sec. Litig.*, 928 F.Supp. 1239. The court granted the motion as to the issue of Section 12(a)(2) liability, stating that the offering documents did not satisfy the definition of a prospectus. *Id.* at 1259. In that case, the pertinent information concerning JWP's offerings was set forth in a private placement memoranda pursuant to § 4(2) of the 1933 Act. *Id.* This Section exempts from Section 5's registration requirements "transactions by an issuer not involving a public offering." *Id., citing* 15 U.S.C. § 77d(2). Applying *Gustafson*, the JWP court held that "private placement memoranda like those at issue are not 'prospectuses' for the purposes of a claim under § 12(a)(2)." *Id.* Thus, the court granted summary judgment to defendants on the Section 12(a)(2) claims. *Id.* Further, the court rejected the plaintiffs "attempt to resurrect their § 12(a)(2) claim by contending that JWP's private placement memoranda were so permeated by fraud that the exemption to registration under § 4(2) did not apply and the notes should have been sold in a registered offering." *Id.* The court stated that if the plaintiffs wanted to argue that the offering should have been registered, they should have

*The Wrong Decision, But It Is Still Business as Usual in the Securities Markets*, 31 Tulsa L.J. 509, 517 (1996) ("*Gustafson* limits the applicability of Section 12(2) to offerings of securities required to be registered under the Act and to public offerings of securities exempt from registration under Section 3 of the Act ...."); Elliot J. Weiss, *Securities Act Section 12(2) after Gustafson v. Alloyd Co.: What Questions Remain?*, 50 Bus. Law. 1209, 1219 (1995) ("[*Gustafson*] seems to establish that liability under section 12(2) can attach only to a transaction registered pursuant to section 5 ..., a transaction that should be registered, or a transaction exempt from registration by reason of section 3."); Stephen M. Bainbridge, *Securities Act Section 12(2) after the Gustafson Debacle*, 50 Bus. Law. 1231, 1257–1258 (1995) ("Gustafson dispositively answers two questions about section 12(2)'s scope: (i) section 12(2) liability extends to fraudulent statements or omissions in statutory prospectuses used in a registered public offering, and (ii) section 12(2) liability does not extend to fraudulent documents used in connection with secondary market transactions."); John C. Coffee, *Re–Engineering Corporate Disclosure: The Coming Debate Over Company Registration*, 52 Wash. & Lee L.Rev. 1143, 1173 (1995) ("Initially, issuers' primary concern with company registration might be the risk of '33 Act liabilities. [After *Gustafson*], in a private placement or in a Regulation S extraterritorial offering, the issuer may face liability under Rule 10b–5, but need not fear liability under Sections 11 or 12(2) of the '33 Act."); Daniel A. Braverman, *U.S. Legal Considerations Affecting Global Offerings Shares in Foreign Companies*, 908 PLI/Corp. 609, 666–67 (1995) ("[T]he liability provisions of the securities laws that apply to U.S. private placements are less draconian than those that apply to public offerings. Section 11 of the Securities Act applies only to S.E.C. registered offerings and, in an important recent decision, the U.S. Supreme Court held in *Gustafson v. Alloyd Co.* that § 12(2) of the Securities Act applies only to public offerings .... The *Gustafson* decision left Rule 10b–5 under the Exchange Act as the principal U.S. federal standard for liability in a private placement."); Margaret A. Bancroft, *Responding to Gustafson: Company Registration and a New Negligence Standard*, 9 InSights No. 7, at 15 (1995) ("[A]fter *Gustafson*, under the federal securities laws, participants in private placements are no longer liable for negligent misstatements in any meaningful way.").

brought a claim under Section 12(a)(1).[15] *Id.*

Similarly, in *ESI Montgomery County v. Montenay Internat'l Corp.*, 899 F.Supp. 1061 (S.D.N.Y.1995), the plaintiff sought leave to amend its complaint, which alleged a Section 12(a)(2) violation. *Id.* Defendants moved for summary judgment and dismissal of the amended complaint, arguing that based on *Gustafson* and the fact that the offering was private, the amendment would be futile. *Id.* at 1064. The court discussed factors such as the number of offerees and acknowledged that had these factors been alleged, it would not have been able to grant the defendants relief. *Id.* at 1065. Because the plaintiff had instead acknowledged that the offering was made pursuant to a private offering memoranda and that it was exempt from registration by Section 4(2), an amendment of the 12(a)(2) claim would be futile. *Id.* Thus, the court suggests that once a plaintiff admits that an offering is subject to a Section 4(2) exemption, any attempted Section 12(a)(2) claim would be futile.

In *Vannest v. Sage, Rutty & Co., Inc.*, 960 F.Supp. 651 (W.D.N.Y.1997), the court granted a motion for summary judgment on the issue of Section 12(a)(2) liability even though the plaintiffs alleged that the offering was actually more similar to a public, rather than a private, offering. *Id.* In that case, Defendant argued based on *Gustafson* that as a matter of law Section 12(a)(2) was inapplicable because the offering at issue was a private placement. The court described the *Gustafson* decision as follows:

> There, the Supreme Court determined that "prospectus" as used in Section 12(a)(2) is a document used only in a public offering of securities by an issuer or controlling shareholder. Because a prospectus must contain the information contained in the registration state-ment—see Section 10, 15 U.S.C. § 77j—, and because only public offerings require a registration statement, the Supreme Court concluded that a prospectus "is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder."

*Id.* at 654, citing *Gustafson*, 513 U.S. at 584, 115 S.Ct. at 1073–1074. The plaintiffs argued that the defendant had the burden of proving that the transaction was not a public offering, and that in order to meet this burden, it had to present evidence regarding the number of offerees, the offerees' sophistication, the size and manner of the offering, and the issuer's relationship to the offerees. *Id.* (citation omitted).

The court acknowledged that *Gustafson's* "attempt to equate public offerings with those that are registered ignores the important fact that not all public offerings are registered." *Id.* (citation omitted). The court explained that courts have taken different approaches since *Gustafson* was decided. *Id.* Some courts have determined that by definition, offerings made via a PPM are not public offerings. *Id.* (citations omitted). Others have refused to dismiss Section 12(a)(2) claims when the securities were offered via a PPM but the plaintiffs argued that the offering was not truly private. *Id.* at 655 (citations omitted).

The court emphasized that the PPM expressly and repeatedly stated that the offering was not subject to registration requirements and that the securities were intended to be sold only to purchasers qualified by Rule 506 of Regulation D. *Id.* Further, the court stated that the plaintiffs had not asserted a Section 12(a)(1) claim and did not dispute that the offering was made via a PPM. *Id.* Although the plaintiffs argued that the offering was not truly

---

**15.** At the time, Section 12(a)(1) was num-bered Section 12(1).

private, they had not argued so for the previous six years and thus the court concluded that they had never seriously contested the private nature of the offering until *Gustafson.* *Id.* Thus, the court chose to follow the line of cases concluding that a PPM by definition is not a public offering within the meaning of Section 12(a)(2). *Id.* The court emphasized in reaching its conclusion that the "stated intent at the time [of the offering] was to characterize the offering as private." *Id.* Accordingly, the court granted summary judgment for defendant on the Section 12(a)(2) claim. *Id.*

■ Further, the fact that there are hundreds of offerees does not turn a COM or PPM into a public offering. In *In re Worldcom, Inc. Sec. Litig.,* 294 F.Supp.2d 431 (S.D.N.Y.2003), the court granted the defendants' motion to dismiss on the issue of whether the offering could subject its offerors to Section 12(a)(2) liability. *Id.* In assessing whether the offering was a private placement, the court noted the following factors: (1) the PPM stated that it was not for the public generally and (2) it stated that the notes it was offering had not been registered under the Securities Act. *Id.* at 454. Although the plaintiffs referred to the offering materials as a "private placement" in their complaint, they sought to amend to add that the offering was mass-produced and offered to hundreds of investors and sold to over 200 buyers in the initial public offering. *Id.* at 454. The court judged from the terms of the offering materials that it was not issued in connection with a public offering despite the possibility that it had been offered to hundreds of investors. *Id.* at 455. Thus, under *Gustafson,* Section 12(a)(2) liability did not apply. *Id.* at 455.

Similarly, in *Glamorgan Coal Corp. v. Ratner's Group,* Civ. No. 93–7581, 1995 WL 406167 (S.D.N.Y.1995), the court concluded that a PPM cannot subject offerors to Section 12(a)(2) liability even though the PPM "contain[ed] information similar to that found in a public offering prospectus" and "[h]undreds of copies" of the PPM were provided to potential investors throughout the country. *Id.* at *1. The court stated, "every court since *Gustafson* . . . has held. in light of *Gustafson,* that § 12(a)(2) applies only to initial public offerings." *Id.* at *2 (citations omitted). Accordingly, the court granted the defendants' motions to dismiss the Section 12(a)(2) claims and did not grant leave to amend because "no matter how the plaintiff might word the claim, the document involved cannot be 'silkenized' into a § 12(a)(2) 'prospectus.'" *Id.* at *3 (citation omitted).

Similar considerations led the court in *Kainos Labs., Inc. v. Beacon Diagnostics, Inc.,* Civ. No. 97–4618, 1998 WL 2016634 (N.D.Cal. Sept.14, 1998) to conclude that the PPM at issue was private and grant the defendant's motion to dismiss. *Id.* The court noted that many courts applying *Gustafson* have found that PPMs are by definition not public offerings. *Id.* at *4 (citations omitted). The court stated that the PPM at issue explicitly stated that it was furnished on a confidential basis. *Id.* at *5. Thus, the court concluded, "The PPM alone cannot lay the basis for a claim brought under Section 12(a)(2) because it indicates in no uncertain terms that its use should be limited only to the recipient of the PPM." *Id.* Plaintiffs argued that the offering must have been made to a number of undetermined investors because the defendant had raised at least $4.2 million from undisclosed investors. *Id.* The court stated that "neither the complaint nor the prospectus explicitly state that [the defendant]'has raised money from a 'number of undetermined investors,' and it is not a reasonable inference to assume that [the defendant] has done so." *Id.*

■ Applying the principles of the above-cited cases to the facts in this case

leads me to conclude that Section 12(a)(2) does not apply to Defendants' offering. Like the plaintiffs in the cases I have discussed, Plaintiffs here argue that the COM in this case was tantamount to a public offering and therefore Section 12(a)(2) applies. The offering itself, however, expressly referred to itself as "confidential." (Brousseau Declaration at Exhibit D). It specifically stated that it was not subject to registration. *Id.* Further, it clearly stated that it was exempt because it was not a public offering. *Id.* The facts that it was intended to be private, it clearly expressed that it was private, and that it was not registered under the Act indicate that the offering was truly a COM, which most cases have held is, by definition, not a prospectus or public offering within the meaning of Section 12(a)(2). Plaintiffs argue that regardless of the express and repeated intent that the offering be a COM, it was public in nature, mainly because there were a large number of offerees. Even though Plaintiffs attempt to dispute the number of offerees, they do not bring a claim under Section 12(a)(1) alleging registration violations. *See infra* Part B(3). They instead rely on *Fisk v. SuperAnnuities, Inc.*, 927 F.Supp. 718 (S.D.N.Y.1996), which did examine the number of offerees, but on a motion to dismiss.[16] *Id.*

*Fisk*, however, is not persuasive authority. In *Fisk*, the court denied the motion to dismiss a Section 12(a)(2) claim. *Id.* The offering at issue was made pursuant to a PPM that stated it was only being offered to an accredited investor as the term is defined in Regulation D. *Id.* at 730. The plaintiff argued that the offering was not limited to the sort of investors the Supreme Court had previously described when defining Section 4(2)'s private placement exemption. *Id.* The court explained that the burden of proving an exemption from registration under the Securities Act is on the person claiming it. *Id.* (citations omitted). The court concluded, just as I did when faced with a similar motion to dismiss, that at the motion to dismiss stage, it was inappropriate to decide that the plaintiff could not prevail on the Section 12(a)(2) claim under any facts. *Compare Fisk*, 927 F.Supp. at 730 ("The fact that the PPM indicates that the offering was [exempt from registration] does not mean that plaintiff cannot prevail on the Section 12(a)(2) claim under any fact that might be proved") *with* Order on Defendants' Motions to Dismiss (DE # 66) at 12 ("Defendants have not met their burden of establishing that Plaintiffs are not entitled to any relief under any set of facts ...."). The *Fisk* court did not reach the issue of whether Section 12(a)(2) applies to offerings that are properly exempt from registration under Section 4(2). The court simply concluded that the burden of proving proper exemption rests with the party claiming the exemption. Although I disagree with that conclusion (*see infra* Part II.B(3)), I also determine that Defendant UBS has shown that its offering is properly exempt from registration (*see infra* Part II.B(4)).

---

**16.** Plaintiffs also cite to *Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir.2003), which suggested in dictum Section 12(a)(2) can apply to unregistered offerings. (Notice of Supplemental Authority, DE 128, filed January 28, 2004). This case involved allegations of a defective registration statement and prospectus. *Id.* Thus, the court was not analyzing an unregistered offering. The court did state, in dictum, that "Section 12 permits a purchaser to rescind a securities sale, whether or not the security is registered, if it is sold by means of a material misstatement." *Id.* at 861, *citing* 15 U.S.C. § 77*l.* The court, however, does not cite to *Gustafson* or any case law for this proposition. It only cites Section 12 itself, which, as the case law in this area demonstrates, does not on its face answer the question of whether subpart (a)(2) applies to unregistered offerings.

In sum, the majority of cases and the above-cited commentary interpret *Gustafson* to mean that a private placement memorandum, which is exempt from Section 5's registration requirements pursuant to Section 4(2), cannot subject an offeror to Section 12(a)(2) liability. Upon application of the decisions and commentary to the facts in this case, Section 12(a)(2) is inapplicable to the offering of interests in the PW Aspen Fund. The offering itself provides that it is a Confidential Offering Memorandum exempt from registration because it does not involve a public offering. (Brousseau Declaration at Exhibit D). These facts suggest that Defendants cannot be subject to Section 12(a)(2) liability for statements made in and related to this offering.

**(2) Cases such as *Swenson,* Which Examine Factors to Determine Whether an Offering Is Exempt, Do Not Apply to this Case.**

██ Plaintiffs argue that rather than focus on the COM label or the fact that the offering was not registered, I should analyze the four factors the former Fifth Circuit articulated in *Swenson v. Engelstad* to determine whether an offering is exempt from registration under Section 4(2). 626 F.2d 421. In its Motion for Summary Judgment, UBS argues that this case and others like it represented courts' attempts to provide guidance to the financial community regarding what types of transactions fit within Section 4(2). (Motion at 27–30). Defendant argues that the advent of Regulation D, promulgated pursuant to Section 4(2), obviated the need for the less precise standards articulated by courts before the SEC stepped in to provide guidance and bright line rules to assist the financial community. (*Id.*). Plaintiffs argue that *Swenson* is still good law in the Eleventh Circuit. (Opposition at 44).

Although *Swenson* remains good law, it does not apply to this case. *Swenson,* and many of the cases similar to it, did not examine the factors in relation to a Section 12(a)(2) claim. Rather, most of these cases examined the factors when assessing liability under other sections of the Act. Further, most of these cases were decided before the Supreme Court ruled in *Gustafson* or the SEC promulgated Regulation D, and most do not discuss Regulation D's effect on the four-factor test. The cases that do hint at the relationship between the factors and Regulation D suggest that they are alternate routes to showing that an exemption applies.

*SEC v. Ralston Purina Co.,* 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953) laid the foundation for the former Fifth Circuit's decision in *Swenson.* In *Ralston Purina,* the Commission filed an action against a corporation pursuant to Section 20(b) to enjoin the corporation from offering unregistered shares of its stock to its employees. *Id.* Section 20(b) provides the following:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, the Commission may, in its discretion, bring an action in any district court of the United States . . . .

15 U.S.C. § 77t(b). The company argued that it was not required to register the offering because it was private and exempt under Section 4(2).[17] *Id.* The Eighth Circuit agreed with the company and dismissed the action. *Id.* The Supreme Court reversed. *Id.* In so holding, however, the Court noted that "[t]he Securities Act no-

---

**17.** At the time of *Ralston Purina,* Section 4(2) was numbered Section 4(1).

where defines the scope of § 4(1)'s private offering exemption." *Id.* at 122, 73 S.Ct. at 983. It stated that whether an offering is exempt turns on whether the offerees need the Act's protection. *Id.* at 125, 73 S.Ct. at 984. Further, the burden was on the offeror to prove an exemption. *Id.* at 126, 73 S.Ct. at 985. Because the defendant did not show that the offerees had access to the kind of information which registration would disclose, the Court stated that the offering should have complied with Section 5's registration requirements. *Id.* at 127, 73 S.Ct. at 985.

Based in part on *Ralston Purina,* the *Swenson* court reversed a district court's judgment for a defendant who claimed that an exemption from registration applied to his offering. *Swenson,* 626 F.2d 421. The plaintiffs had alleged several securities claims, including actions under Sections 12(a)(1) and 12(a)(2). *Id.* The former Fifth Circuit examined the issue of whether the offering fit within Section 4(2)'s exemption from Section 5's registration requirements, and thus absolved the investors from liability under Section 12(a)(1) and Section 15[18] of the Act. *Id.* at 425. In that context, not during a discussion of 12(a)(2) liability, the court cited *Ralston Purina* for the proposition that the private offering exemption is an affirmative defense that must be raised and proved by the defendant. *Id., citing Ralston Purina,* 346 U.S. at 126, 73 S.Ct. at 985. Further, the court stated that whether an offering is public or private is a question of fact which must be resolved by examining the particular circumstances of each case. *Id.* The court

articulated four useful factors in evaluating the character of an offering: (1) the number of offerees and their relationship to each other and to the issuer, (2) the number of units offered, (3) the size of the offering, and (4) the manner of the offering. *Id.* The court further explained that the ultimate issue is " 'whether the particular class of persons affected need the protection of the Act.' " *Id.* (quotation omitted). The former Fifth Circuit stated that one of the defendants had not carried his burden of proving the number or identity of the offerees, and thus, he did not meet the four-factor test with regard to the plaintiffs' Section 12(a)(1) claim. *Id.* at 427. Accordingly, the court reversed the judgment for this defendant. 626 F.2d 421.

Two important factors distinguish *Ralston Purina, Swenson,* and most of the other cases on which Plaintiffs rely from the present action. First, the issue in these cases was not whether the offeror was subject to liability for fraud under Section 12(a)(2). Second, most of these cases were decided before Regulation D was promulgated. *See, e.g., Doran v. Petroleum Mgmt. Corp.,* 545 F.2d 893, 897 (5th Cir.1977) (pre-Regulation D[19] case examining factors when addressing Sections 5 and 12(a)(1) claims); *SEC v. Murphy,* 626 F.2d 633 (9th Cir.1980) (pre-Regulation D case affirming summary judgment against the defendant where violations of Sections 5 and 17 of the Act and Section 10(b) of the Securities Exchange Act were involved, but not of Section 12(a)(2)); *Cook v. Avien,* 573 F.2d 685, (1st Cir.1978) (ex-

**18.** Section 15 of the Act subjects to liability a person who controls any person found to be liable under Sections 11 and Section 12 of the Act. 15 U.S.C. § 77o.

**19.** Although Rule 146, the precursor to Regulation D's Rule 506 (J. William Hicks, 7C *Exempted Transactions Under the Securities Act of 1933,* § 11.01[5] (2001) (explaining that

Rule 506 of Regulation D replaced Rule 146 as a nonexclusive safe harbor rule)), was in effect at the time, Rule 146 only applied to offers commencing on or after June 10, 1974 and thus had no bearing on the case. *Doran,* 545 F.2d at 897. Accordingly, the *Doran* court did not address the effect of Regulation D or a similar rule on the factors-based test.

amining various factors to determine whether an offering was public when addressing the plaintiffs' Section 12(a)(1) claim); *SEC v. Continental Tobacco Co. of South Carolina,* 463 F.2d 137 (5th Cir.1972) (involving an alleged failure to register an offering, not a Section 12(a)(2) claim); *Hill York Corp. v. American Internat'l Franchises,* 448 F.2d 680, 695 (5th Cir.1971) (examining specific factors of the offering in assessing a Section 12(a)(1) claim, and wrongly, in light of the future decision in *Gustafson,* stating that "contrary to a Section 12(1) violation, liability under Section 12(2) would not be affected by a finding that the offering was private").

In *Ralston Purina,* the issue was whether the SEC could enjoin the offeror for failing to register its offering. *Ralston Purina,* 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494. Thus, the question in that case was whether the defendant company was subject to sanctions for not registering its offering, not whether the company was subject to sanctions for fraud. Further, this 1953 case was decided well before Regulation D was promulgated. The Court specifically noted the lack of guidance in the statute regarding what constitutes a public versus a private offering. *Id.* at 122, 73 S.Ct. 981. This language

indicates that Regulation D might alter the Court's view of which securities qualify for a Section 4(2) exemption. Likewise, in *Swenson,* the court discussed the four factors in the context of a Section 12(a)(1) claim. *Swenson,* 626 F.2d 421. Regulation D had not yet been promulgated.

In a case that was decided after Regulation D's promulgation,[20] the court suggested, based on case law from the former Fifth Circuit, that compliance with either the four factors or Regulation D gives an offering Section 4(2) exempt status. *Weprin v. Peterson,* 736 F.Supp. 1124 (N.D.Ga. 1988). *Weprin* addressed the *Swenson* factors in the context of a 12(a)(1) claim. *Id.* Section 12(a)(2) was not involved. *Id.* After the court determined based on the *Swenson* factors that the offering was private, the court stated, "Although Regulation D can be considered as a statement clarifying and unifying the requirements for exemption under Section 4(2) ... the failure to qualify under Regulation D does not create the presumption that an exemption under Section 4(2) is not available." *Id.* at 1130, *citing Mary S. Krech Trust v. Lakes Apartments,* 642 F.2d 98, 102 (5th Cir.1981) ("[A] failure to satisfy all conditions of the Rule does not raise the presumption that the offering cannot be exempt.").[21] *Weprin* and *Mary S. Krech*

**20.** The court in *Premier Capital Management, L.L.C. v. Cohen,* Civ. No. 02–5368, 2003 WL 21960357, 2003 U.S. Dist. LEXIS 14137 (N.D.Ill. Aug. 14, 2003) also suggests that compliance with Regulation D renders an offering private. The offering at issue stated that the offering was a private placement, that it was made pursuant to Regulation D and that no public trading market existed for the shares offered. *Id.* at *10–11, 2003 U.S. Dist. LEXIS 14137 at *35–*36. The court explained that sales of securities made pursuant to Regulation D are not public offerings, but it stated that the defendants bore the burden of proving that the Regulation D exemption applied. *Id.* at *11, 2003 U.S. Dist. LEXIS 14137 at *37. Although I disagree with the conclusion that a defendant has the burden of

proving that it is properly exempt from registration even when the claim is not one for improper registration (*see infra* Part II.B(3)), I conclude that there is no material dispute that Regulation D applies (*see infra* Part II.B(4)). Further, I note that the *Cohen* court was examining a motion to dismiss and reached the same outcome I did when I examined a similar motion in this case.

**21.** In *Mary S. Krech Trust,* the plaintiffs brought claims pursuant to Section 12(a)(1) and 12(a)(2). *Mary S. Krech Trust,* 642 F.2d 98. In affirming the jury verdict against them, the court first discussed the *Swenson* factors and then Rule 146's requirements for private offerings. *Id.* at 101. The court ex-

*Trust* indicate that there is more than one method of obtaining exempt status for an offering under Section 4(2). *Weprin* further suggests that if a court cannot use the "clarifying and unifying" Regulation D (*see Weprin*, 736 F.Supp. at 1130) in determining whether an offering is exempt, an alternate route to obtaining Section 4(2) exempt status is meeting the four factors.

Despite the fact that Regulation D does provide guidance in this case, Plaintiffs rely on cases that do not involve the Regulation. In *Maldonado v. Dominguez*, 137 F.3d 1 (1st Cir.1998), the plaintiffs sought to amend their complaint's allegations of Section 12(a)(2) liability since *Gustafson* was decided after the complaint was filed. *Id.* at 8. Specifically, they sought to add allegations regarding the public nature of the offering. *Id.* The court denied the request because it determined, based on *Swenson*-like factors, that the offering was

private. *Id.* Thus, it affirmed the lower court's dismissal of the case. *Id.* The court did not have the option of examining Regulation D because the offerors were not claiming that they were exempt under it. Thus, the court had no choice but to examine other factors in determining whether the offering was private.[22] In this case, if Plaintiffs had brought a Section 12(a)(1) claim alleging that the offering violated registration requirements, based on the reasoning of *Mary S. Krech Trust* and *Weprin*, I could have first examined Regulation D to determine whether the offering is exempt.

■ Plaintiffs' final argument for applying *Swenson* factors rather than Regulation D is that offerors cannot rely on Regulation D to insulate them from Section 12(a)(2) liability because the Regulation was not meant to alter the anti-fraud pro-

plained that a "failure to satisfy all conditions of the Rule does not raise the presumption that the offering cannot be exempt." *Id.* at 102. Because the defendants established the number and identity of the offerees, the court stated that there was sufficient evidence to conclude that the offering was exempt. *Id.* at 103. The court then discussed the jury's finding that there were no material misrepresentations pursuant to Section 12(a)(2) and affirmed that finding as well.

**22.** The court in *Sloane Overseas Fund, Ltd. v. Sapiens Internat'l Corp.*, 941 F.Supp. 1369 (S.D.N.Y.1996), a case on which Plaintiff relies, differs from this case because it did not examine Regulation D or another Section 4(2) exemption. *Id.* That case involved a different regulation, Regulation S, and turned on the fact that Regulation S, unlike Regulation D, is not exempt under Section 4(2). *Id.* In that case, the defendant had sold debt securities, which the court referred to as notes. *Id.* at 1372. The offering was made via an Offering Circular which stated that the notes could be sold outside the United States pursuant to a registration exemption found in Regulation S or to qualified institutional buyers in the United States pursuant to an exemption under Rule 144A, which allows for private resales of

securities to institutions. *Id.* The defendants argued based on *Gustafson* that because the offering was exempt from registration under Regulation S, they could not be subject to Section 12(a)(2) liability. *Id.* at 1376. The court characterized *Gustafson* as follows: "in so defining the term 'prospectus,' the Court effectively limited § 12(2) claims to all public offerings subject to the registration and prospectus requirements of § 10 of the Act, which exempts securities issued pursuant to § 3 and transactions pursuant to § 4." *Id.* (citation omitted). The court explained, however, that Regulation S offerings are not exempt pursuant to Section 3 or Section 4 of the Act. *Id., citing* 15 U.S.C. § 77(c). Accordingly, the court examined the nature of the offering to determine whether it was public and concluded that the wide distribution of the offering made it a public offering. *Id.* Thus, the court stated that Section 12(a)(2) applied and denied the defendants' motion to dismiss as to that ground. *Id.* at 1376–1377. In this case, however, Regulation D does provide an exemption pursuant to Section 4(2). Thus, under the *Sloane Overseas* court's reading of *Gustafson*, because the COM is exempt pursuant to Section 4(2), it is exempt from Section 10, and it is not a public offering that falls within Section 12(a)(2).

visions of the Act. Indeed, the Preliminary Notes to Regulation D reads, "Such transactions are not exempt from the antifraud, civil liability, or other provisions of the federal securities laws." 17 C.F.R. §§ 230.501–230.508. Further, *Landreth Timber v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985) states that "although § 4(2) of the 1933 Act, 15 U.S.C. § 77d(2), exempts transactions not involving any public offering from the Act's registration provisions, there is no comparable exemption from the antifraud provisions." *Id.* at 692, 105 S.Ct. 2297. This language simply means that Regulation D relates to exemptions from registration, not to exemptions from fraud. My reading of Regulation D does not alter fraud liability; rather, it clarifies a registration exemption. In its entirety, Section 4(2) reads, "The provisions of section 77e of this title shall not apply to—(2) transactions by an issuer not involving a public offering." 15 U.S.C. § 77d(2). Regulation D was promulgated under that Section, not to create a new class of exemptions, but to provide clarity, just as the *Swenson* factors were not articulated to create a new exemption, but to provide a workable formula to determine whether an offering is private. Neither Regulation D nor *Swenson* have altered or eliminated fraud liability. A plaintiff seeking recourse against an offeror who makes false statements in an offering that is exempt from registration pursuant to Regulation D can still bring an action under Section 10(b) of the Securities Exchange Act.[23]

**(3) Registration Violations Subject an Offeror or a Seller to Section 12(a)(1) Liability, not Section 12(a)(2) Liability.**

■ Section 12(a)(2) relates to liability for fraud, while Section 12(a)(1) concerns

liability for violating registration requirements. UBS states that if Plaintiffs seek to argue that the offering did not actually comply with Regulation D, they should have brought a claim under Section 12(a)(1), not under Section 12(a)(2). Plaintiffs never refute this point. Interestingly, they discuss the structure of Section 12 as follows:

Section 12(a)(1) and Section 12(a)(2) are not redundant. Section 12(a)(1) provides liability in the event someone sells unregistered securities that were required to be registered under Section 5. The typical defense to a claim under section 12(a)(1) is that registration was not required because either the securities or the transaction was exempt from registration under sections 3 and 4. Section 12(a)(1) does not concern itself with whether any false or misleading statements were made.

On the other hand, Section 12(a)(2) provides liability in the event that someone makes false or misleading statements in the prospectus. Nothing redundant is found in that statutory scheme . . . .

(Opposition at 47–48). I agree. The statute clearly creates liability for registration violations under Section 12(a)(1) and liability for fraud under Section 12(a)(2).

Again, courts have disagreed on this issue, and there is no controlling Supreme Court or Eleventh Circuit case law on point. In *In re JWP Sec. Litig.,* as in this case, the plaintiffs were not able to sustain a Section 12(a)(2) claim for misrepresentations in and relating to the offering because the offering was made via a private placement memorandum. *In re JWP Sec. Litig.,* 928 F.Supp. 1239. Further, the court rejected the plaintiffs' "attempt to resurrect their § 12(a)(2) claim by con-

---

**23.** Plaintiffs stated that they would seek leave to amend their complaint to allege Section 10(b) violations if I entered summary judg-

ment for Defendants. (Transcript at 49–51). Accordingly, I grant Plaintiffs leave to amend to allege violations of Section 10(b).

tending that JWP's private placement memoranda were so permeated by fraud that the exemption to registration under § 4(2) did not apply and the notes should have been sold in a registered offering." *Id.* at 1259. The court stated that if the plaintiffs wanted to argue that the offering should have been registered, they should have brought a claim under Section 12(a)(1). *Id.; see also Vannest v. Sage & Rutty,* 960 F.Supp. at 655 (stating that the plaintiffs had never asserted a Section 12(a)(1) claim and thus their argument that the offering was not truly private was not compelling).

Other cases suggest that defendants have the burden of proving that an exemption takes them out of the realm of Section 12(a)(2) fraud. *See, e.g., Fisk,* 927 F.Supp. at 731; *Premier Capital Management,* 2003 WL 21960357 at *11, 2003 U.S. Dist. LEXIS 14137 at *37. These cases, however, do not address the argument that Section 12(a)(1) is the proper statute pursuant to which plaintiffs can bring claims of registration violations and force defendants to prove an exemption applies. Nor do they state that Plaintiffs can bring a claim for a registration violation under Section 12(a)(2). In any event, I conclude that UBS has shown that it did comply with Regulation D.

### (4) There Is No Material Dispute that the Offering Complied with Regulation D.

▬ I conclude based on the record that the offering of interests in the PW Aspen Fund was properly exempt from registration requirements pursuant to SEC Regulation D. The specific exemption that applies is 17 C.F.R. § 230.506, which is titled "exemption for limited offers and sales without regard to dollar amount of offering." It provides as follows:

(a) Exemption. Offers and sales of securities by an issuer that satisfy the conditions in paragraph (b) of this section shall be deemed to be transactions not involving any public offering within the meaning of section 4(2) of the Act.

(b) Conditions to be met—(1) General conditions. To qualify for an exemption under this section, offers and sales must satisfy all the terms and conditions of §§ 230.501 and 230.502.

(2) Specific Conditions—(I) Limitation on number of purchasers. There are no more than or the issuer reasonably believes that there are no more than 35 purchasers of securities from the issuer in any offering under this section...

(ii) Nature of purchasers. Each purchaser who is not an accredited investor either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or the issuer reasonably believes immediately prior to making any sale that such purchaser comes within this description.

17 C.F.R. § 230.506. Further, Section 230.508 provides that an issuer will not lose exempt status when there is a "good faith and reasonable attempt" to comply with the "accredited investor" provisions of Regulation D.

Defendant states that this Regulation D exemption applies here because (1) there is no limit on the dollar amount of the offering and (2) only accredited investors purchased interests in the Fund. Sections 3(b) and 4(6), which place a five million dollar cap on exemptions, were discussed at length during oral argument. (Transcript at 26–29). Since Rule 506 is based on § 4(2), not § 3(b) or § 4(6), however, 17 C.F.R. § 230.506 places no limit on the aggregate offering price. Louis Loss and Joel Seligman, *Fundamentals of Securities Regulation* at 363, 4th ed. (2001). Thus, the dollar amount of the offering is

irrelevant for purposes of determining whether Regulation D applies.

Further, there is no material dispute that the offering was only made to accredited investors. Section 230.501(a)(5)-(7) defines the term "accredited investor" to include the following categories of investors:

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $ 1,000,000;

(6) Any natural person who had an individual income in excess of $ 200,000 in each of the two most recent years or joint income with that person's spouse in excess of $ 300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $ 5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in § 230.506(b)(2)(ii) . . . .

*Goodwin Properties v. Acadia Group, Inc.*, Civ. No. 01–49, 2001 WL 800064 (D.Maine July 17, 2001) discusses Regulation D's definition of the term "accredited investor." In that case, Magistrate Judge Cohen recommended granting the defendants' motions to dismiss. *Id.* Plaintiffs claimed that in conjunction with their confidential private offering memorandum, defendants violated Sections 5 and 12(a)(2) Act. *Id.* at *4. Defendants argued that their offering (1) was exempt from Section 5's registration requirements pursuant to Section 4(2) and Regulation D, which the court described as the regulations that implement Section 4(2), and (2) was private and therefore not subject to 12(a)(2) liability. *Id.* at *5. Plaintiffs argued that Regulation D did not actually apply because they were not accredited investors. *Id.* at *6. The plaintiffs tried to limit the defini-

tion of an "accredited investor" to the Act's definition in Section 2(a)(15). *Id.* at *7. The court stated that Section 2(a)(15) specifically included in its definition " 'any person who . . . qualifies as an accredited investor under rules and regulations which the Commission shall prescribe,' 15 U.S.C. § 77b(a)(15)(ii), and thus included the definition provided by Regulation D." *Id.* Further, the plaintiffs represented in writing at the time of the sale that they were accredited investors. *Id.* According to the court, the plaintiffs "cannot now disavow those representations in order to support their claims against the defendants." *Id.* (citation omitted). Thus, the Magistrate Judge concluded that the offering was private and recommended dismissal of the Section 12(a)(2) count. *Id.* at *10.

Similarly, in this case, Plaintiffs cannot disavow their representations that they were accredited investors. The Investor Application included a section titled "Accredited Investor Representation," which reads as follows: "The Undersigned is an 'accredited investor' under Regulation D [generally, net worth in excess of $1 million for individuals (together with spouse) or total assets in excess of $5 million for entities] . . . ." (Brousseau Declaration Exh. E, Investor Application at 11 (brackets in original)). The record also shows that UBS followed a number of procedures to ensure that the investors were accredited. (Brousseau Declaration). For example, UBS financial advisors had to complete offeree questionnaires attesting to the fact that the FA was aware of and could document the financial circumstances or sophistication of the prospective investor. (*Id.* at ¶ 7). Plaintiffs do not cite to the record or argue that they were not really accredited. They simply state that it is disputed "[w]hether the defendants met the requirements of Regulation D when there were over 220 purchasers that defendants did not have any relationship with and cannot account for and there over

three hundred Client Market Kits that are not accounted for." (Plaintiff's Statement at 19 ¶ 8). This statement by itself does not indicate whether or not the purchasers were accredited or whether Plaintiffs use the term "purchasers" as it is used in Regulation D. Even if the latter is the case, Plaintiffs offer no support for their statement from the record. Further, it is unclear what they mean when they state that over 300 kits were not accounted for, but in any case, the number of investors or kits does not provide any insight as to whether or not these investors were accredited because Rule 506 allows offerings to an unlimited number of accredited investors. Thus, I conclude that there is no material dispute in the record that the offering complied with Regulation D.

### III. This case is appropriate for certification.

■ 28 U.S.C. § 1292(b) allows a party to seek interlocutory review of a case under certain circumstances which are present in this case. Specifically, Section 1292(b) provides as follows:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate determination of litigation, he shall state so in writing in the order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order . . . .

28 U.S.C. § 1292(b).

This case involves three controlling questions of law as to which there is sub-stantial ground for difference of opinion. First, as indicated throughout this Order, although a majority of post-*Gustafson* courts and the commentary have concluded that private placement memoranda subject to a Section 4(2) exemption are not actionable under Section 12(a)(2), there are courts that disagree. The Eleventh Circuit has not definitively answered the question of whether private placement memoranda are subject to Section 12(a)(2) liability. Second, the Eleventh Circuit has not established whether *Swenson* applies to a Section 12(a)(2) claim. In that case, the court examined various factors in order to determine whether an offering was public or private in nature for the purposes of Section 12(a)(1) liability. Since *Gustafson*, examining the nature of an offering to determine whether it is public or private has become important for the purposes of assessing Section 12(a)(2) liability. The Eleventh Circuit, however, has not yet determined whether a court *must* use the *Swenson* factors to assess Section 12(a)(2) liability, or whether a court has the option of using regulations the SEC has promulgated since *Swenson* was decided. Third, neither the Supreme Court nor the Eleventh Circuit have answered the question of whether a plaintiff can allege that an offering was improperly exempt from registration requirements under Section 12(a)(2). Again, courts in other jurisdictions have disagreed as to the answer to this question.

Further, an immediate appeal from this Order may materially advance the ultimate determination of this litigation. Proceeding under a Section 10(b) claim will require the parties to expend time and money arguing under an entirely different statute and will require the use of considerable judicial resources to analyze the distinct standards used to examine Section 10(b) claims. If the Eleventh Circuit, however, decides to review this case and determines

that unregistered offerings are subject to Section 12(a)(2) liability, the case can proceed under a Section 12(a)(2) claim rather than under an entirely new theory.

### Conclusion

Plaintiffs' claim is not barred by the statute of limitations. Thus, upon examination of the remaining issues in the case, I conclude (1) that Section 12(a)(2) only applies to registered offerings, (2) the *Swenson* factors do not apply to Section 12(a)(2) claims, particularly when offerors fit within Regulation D, and (3) a claim that registration statutes were violated does not lie under Section 12(a)(2). Because these three issues have not been answered by the Supreme Court or Eleventh Circuit, and because courts in other jurisdictions have taken different positions on the issues, this Order is appropriate for immediate review by the Eleventh Circuit pursuant to 28 U.S.C. § 1292(b). Further, I conclude that there is no material dispute that the offering complied with Regulation D. Accordingly, it is hereby ORDERED AND ADJUDGED:

1. Defendant UBS' Motion for Summary Judgment (DE # 91) is GRANTED.

2. Because Plaintiffs cannot assert a cause of action under Section 12(a)(2), their Second Amended Complaint (DE # 52) is dismissed, and all pending motions, including Defendant Mark Advisor's Motion for Summary Judgment (DE # 97), Plaintiffs' Motion for Class Certification (DE # 83), and Plaintiffs' Motion to Supplement Motion to Certify Class Action (DE # 133), are DENIED AS MOOT.

3. Plaintiffs shall have twenty days from the date of entry of this Order to amend their Second Amended Complaint to add Section 10(b) claims. In the alternative, they may seek immediate appeal to the Eleventh Circuit because of the issues I have indicated are appropriate for certification. In the event that they take the latter route, the twenty-day period for amendment and the statute of limitations for bringing a Section 10(b) claim will be stayed pending appeal.